# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CV-94-000MN

.......................................
BEGASHAW AYELE, PRO SE,
         Plaintiff,
V
COGNISIA SECURITY COMPANY, INC.,
         Defendant.
.......................................

Deposition of BEGASHAW AYELE, taken on behalf of the Defendant, pursuant to Notice under the Federal Rules of Civil Procedure, before Janice A. Maggioli, RPR, RMR, CRR, and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Duane Morris, 470 Atlantic Avenue, Boston, Massachusetts, on April 25, 2005, commencing at 10:00 a.m.

MAGGIOLI REPORTING SERVICES, INC.
48 Watson Street
Braintree, Massachusetts 02184
(781) 356-2636

---

APPEARANCES:

Duane Morris, LLP
[By Bronwyn Roberts, Esq.]
470 Atlantic Avenue
Boston, Massachusetts 02210
    On behalf of the Defendant.

Begashaw Ayele, Pro se.

---

I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

Begashaw Ayele
By Ms. Roberts  5

EXHIBITS

| Id. | Description | Page |
|---|---|---|
| 1 | Answers to ints | 15 |
| 2 | Resume | 83 |
| 3 | Employment application | 93 |
| 4 | Employment history | 94 |
| 5 | Charge of discrimination | 114 |
| 6 | Job description | 132 |
| 7 | Residence listing | 134 |
| 8 | Employment/transcript inquiry | 135 |
| 9 | Disclosure and Authorization | 135 |
| 10 | Employment Agreement | 136 |
| 11 | Equal Employment Opportunity Data | 137 |
| 12 | CORI Request Form | 138 |
| 13 | Referral Source | 139 |

EXHIBITS

| Id. | Description | Page |
|---|---|---|
| 14 | Notice and Certification Request | 140 |
| 15 | Commercial Standards of Employment | 140 |
| 16 | Employment/Transcript Inquiry | 141 |
| 17 | Questionnaire | 142 |
| 18 | Request for Verification | 142 |
| 19 | Notice of Charge of Discrimination | 175 |

## Page 5

```
 1              STIPULATION
 2       It is agreed that the reading
 3  and signing of the deposition will not be
 4  waived.
 5          MS. ROBERTS: Would you swear in
 6  Mr. Ayele when you get a chance?
 7
 8          BEGASHAW AYELE,
 9       having been satisfactorily
10       identified and duly sworn by the
11       Notary Public, was examined and
12       testified as follows:
13          EXAMINATION BY MS. ROBERTS
14  Q.  Mr. Ayele, my name is Bronwyn Roberts. As you
15      know, I represent Cognisia Security Company,
16      Inc., and I have some questions for you today
17      for your deposition.
18          If you don't understand any
19      question that I ask, please ask me to rephrase
20      it.
21  A.  Okay.
22  Q.  Otherwise, I'm going to assume that the answers
23      that you give are responsive to the questions I
24      ask. Is that agreeable to you?
```

## Page 6

```
 1  A.  Okay.
 2  Q.  Mr. Ayele, what did you do to prepare for
 3      today's deposition?
 4  A.  Can I ask you before I answer the question?
 5      After the deposition is completed, I will have
 6      the right to review so that you can attach what
 7      they call errata sheet?
 8  Q.  That's right. We can do that. It will be sent
 9      to you.
10  A.  Okay.
11  Q.  I'll send you a copy.
12  A.  Okay.
13  Q.  You can make any changes that you feel are
14      necessary.
15  A.  Okay.
16  Q.  And we'll agree that once you get a copy, that
17      you will return it to me within 30 days?
18  A.  Signature, yes. Okay. What was the question?
19  Q.  The question was, what did you do to prepare
20      for today's deposition?
21  A.  I see my complaint.
22  Q.  Yes.
23  A.  And the document you sent me last time.
24  Q.  Did you speak with anybody?
```

## Page 7

```
 1  A.  No. On the deposition.
 2  Q.  Did you speak with anyone generally about this
 3      case?
 4  A.  Yes. When I was making my whole research,
 5      three, four, five, six, seven months ago all
 6      the way, since I filed the charge from the
 7      Commission I make my own research, and the
 8      deposition, I told you that it's work product
 9      effort, so I will not produce any name or any
10      document.
11  Q.  You are here for a deposition. That's not a
12      proper objection to my question. Are you
13      refusing to answer the question of who you
14      spoke with regarding this case?
15  A.  Yes, I will.
16  Q.  You are refusing for the record to tell me the
17      identity of the people that you spoke with?
18  A.  I never spoke to anybody about the deposition.
19  Q.  I understand that. About your case. Are you
20      refusing to tell me today at your deposition
21      the names of the individuals that you spoke to
22      about your case?
23  A.  Yes. I find some information, some people. I
24      will not tell you that people. That's clear I
```

## Page 8

```
 1      will not tell you that. I refuse to answer
 2      that question because it's under the work
 3      product theory I will tell you. That's the
 4      answer, yes.
 5  Q.  Well, I will move to compel you to answer that
 6      question. How many people did you speak with?
 7  A.  Maybe one or two, I think.
 8  Q.  Were the one or two people that you spoke with
 9      employee ease of Cognisia?
10  A.  People who has knowledge about the company,
11      people who applied the same job I was denied,
12      yes.
13  Q.  So they were -- I'm sorry, I'm not sure if I
14      understood your answer. You spoke with people
15      who had applied to Cognisia?
16  A.  Yes.
17  Q.  Did you also speak with employees of Cognisia?
18  A.  Yes. Yes.
19  Q.  Did you speak with former employees of
20      Cognisia, as well?
21  A.  I don't know about former or present, but when
22      I see the badge (Indicating), I talk about some
23      branch, where the company has some branches so
24      that I will have some idea about the company.
```

**Page 149**

1  A.  And I say, "How are you doing?"
2      And he say, "I'm fine."
3      Which location? I didn't ask
4  that detail. I didn't ask him.
5  Q.  What did you ask?
6  A.  I asked him how fast the drug test completed.
7  He says, "One day."
8      "It finish in one day?"
9      "Yes."
10     Okay. I got to go and check the
11 result, and I went there, and I get the result
12 I was negative, no drug problem.
13 Q.  Okay.
14 A.  And then, okay, that guy was tested with me. I
15 see him in the street with the uniform, and I
16 have completed the drug test, but they give me
17 all excuse every time I call where I should
18 work. They say, wait, we'll assign you. Wait,
19 we'll find you work.
20 Q.  Let me ask the questions. Do you know anything
21 about whether this Hispanic man was -- had --
22 strike that.
23     Do you know anything about the
24 educational background of this Hispanic man?

**Page 150**

1  A.  I never --
2  Q.  No?
3  A.  No.
4  Q.  Do you know anything regarding the work
5  experience of this Hispanic man?
6  A.  (Shakes head).
7  Q.  No?
8  A.  No.
9  Q.  Do you know anything about the hours that this
10 Hispanic man was working?
11 A.  I didn't interview him in detail. I simply ask
12 him "Did they hire you?"
13     "Yes, they hire me." He started
14 already.
15 Q.  Do you know if his job had a concierge-type
16 position or was a walking position?
17 A.  I didn't --
18 Q.  You don't know, do you?
19 A.  No.
20 Q.  You said in your MCAD charge that you know that
21 Cognisia hired people who were given job
22 assignments that did not involve walking. How
23 do you know that?
24 A.  How many companies does Cognisia have in the

**Page 151**

1  city? They have Verizon downtown. They have
2  another -- somewhere in downtown.
3  Q.  Do you know one individual -- can you name one
4  individual that was hired in a concierge-type
5  position in and around December of 2003?
6  A.  Not only in December -- only December, from the
7  time I was denied people work in a position
8  that has walking responsibility, sitting
9  responsibility, combination of both. So --
10 Q.  Okay. Who? Can you name any individual that
11 was hired to work at Cognisia in a job that did
12 not involve walking? Because you say --
13 A.  Are you asking me 300 people to name it now?
14 Q.  You say you know. In your MCAD charge you say,
15 "Respondent has hired many other nonblack
16 individuals as security officers and also had
17 job assignments that did not involve walking."
18 A.  Yes.
19 Q.  What information do you base that on?
20 A.  I checked my research. I did my job.
21 Q.  Who did they hire? What individuals were hired
22 for --
23 A.  To name the individual?
24 Q.  I'm asking you what you are basing your

**Page 152**

1  complaint on.
2  A.  Yeah, I ask some people, some work site. I ask
3  them what kind of jobs they do. Some people
4  they say --
5  Q.  Do you know when those people were hired?
6  A.  When hired?
7  Q.  Do you know when those people were hired?
8  A.  Yes, fresh people.
9  Q.  They were new people?
10 A.  New people.
11 Q.  How do you know?
12 A.  But some of them I never seen them in that job.
13 Some people may have been there.
14 Q.  Did you ask them "When did you get hired"?
15 A.  Yes, I ask.
16 Q.  Who did you ask?
17 A.  I ask people in many places.
18 Q.  Which places?
19 A.  Many places. You are --
20 Q.  Specifics.
21 A.  Not specifics. You are asking me the research
22 I make for this lawsuit.
23 Q.  You are talking about a work product privilege
24 which you, as a nonlawyer, don't enjoy. You

**Page 153**

1  don't have a work product privilege. You are
2  not a lawyer, correct?
3  A. Well, I did mine.
4  Q. So you're saying you are refusing to tell me
5     names of the individuals and the places that
6     they work of people who were hired into jobs
7     that did not involve walking?
8  A. There are many people.
9  Q. You're not going to tell me?
10 A. I will not tell you.
11 Q. You refuse?
12 A. Yes.
13 Q. Then I'm going to have to move to compel if
14    that's what you're basing your lawsuit on.
15 A. Let's continue.
16 Q. I'm going to ask other questions. I have a lot
17    of other questions.
18 A. Okay.
19 Q. The -- other than the Hispanic man, do you know
20    if other applicants were hired who were white?
21 A. There have been many, but still you are asking
22    me the same question.
23 Q. And you won't give that answer?
24 A. The same answer.

**Page 154**

1  Q. And you won't answer whether you know if any
2     applicants were Asian, correct?
3  A. Asian?
4  Q. Yes.
5  A. What do you mean Asian?
6  Q. Asian. From Asia. Chinese, Japanese, Pacific.
7  A. I did my research. File the summary judgment
8     and you will get the answer. That's how we can
9     conclude it.
10 Q. I think I'll file a motion to compel. Do you
11    know the ethnic origin of any of the applicants
12    that received jobs?
13 A. Yes, Spanish guy.
14 Q. Anyone else?
15 A. Some other white people.
16 Q. Is it fair to say that you don't know if there
17    were any other applicants of Ethiopian descent?
18 A. Dr. Awake Alemannon. He applied. He was not
19    hired.
20 Q. He was not hired?
21 A. He was not hired.
22 Q. Are you familiar with Dr. Awake's job
23    qualifications?
24 A. Security job he work. Maybe people has been

**Page 155**

1  hired less than his qualification. Yes, I know
2  about him.
3  Q. Do you know what hours he was looking for?
4  A. I didn't see his application. I didn't see.
5  Q. So you're not familiar with his application
6     specifically, correct?
7  A. I don't.
8  Q. Do you know whether Dr. Awake passed a drug
9     test?
10 A. He was not sent.
11 Q. He was not sent?
12 A. Never.
13 Q. Do you know if he passed a background check or
14    a reference check?
15 A. He was not -- he was not considered at all.
16 Q. How do you know that?
17 A. He is my friend.
18 Q. How do you know that he wasn't considered?
19 A. He was not sent to for the drug test. He was
20    not interviewed just as I was, and at least
21    myself I went through certain steps. He never
22    go that way, so he outrightly was rejected.
23 Q. But you made it to at least an interview,
24    correct?

**Page 156**

1  A. What?
2  Q. You made it to an interview, correct?
3  A. Yes, with Jennifer, and what's that name?
4     Nicole.
5  Q. So it's fair to say that for the other
6     applicants from the job fair you don't know
7     their job histories, correct, from the job
8     fair?
9  A. As an applicant, just I went to apply for
10    myself. I didn't go there to scrutinize
11    everybody.
12 Q. Right. And you don't know their job
13    experiences?
14 A. I don't know their job experience.
15 Q. You didn't see their resumes?
16 A. That's not my business.
17 Q. You don't know their educational history?
18 A. I never see anything.
19 Q. You didn't review their applications, correct?
20 A. I am not Human Resource person.
21 Q. So you don't know what factors Cognisia
22    considered in making the decision to hire or
23    not hire other applicants, correct? You don't
24    know, do you?

### Page 165

1   Q. Did they?
2   A. Most probably, yes, but if I didn't take that
3      job because of transportation problem --
4   Q. Did they offer you a job that you could not
5      take because of a transportation problem?
6   A. I think one of the conversation, I don't know
7      exactly --
8   Q. Do you remember where the job was?
9   A. Not really, but I remember if I take it a given
10     day, and transportation was not available.
11  Q. So you could not accept the job offer, correct?
12  A. Yes.
13  Q. They found a job, and they offered it to you,
14     but you couldn't accept it because of
15     transportation problems, correct?
16  A. Yeah, but people --
17  Q. Is that correct?
18  A. People if they don't want to hire you, they can
19     give you any reason.
20  Q. Did --
21  A. They can offer you --
22  Q. Who called you and said, "We have a job for
23     you?
24  A. I don't remember.

### Page 166

1   Q. It was either Jennifer or Nicole, correct?
2   A. After that, I mostly talked to -- after the
3      interview, most of my conversation was with
4      Jennifer -- Nicole.
5   Q. With Nicole?
6   A. Yes.
7   Q. And she at one point called you, correct, and
8      offered you a job that you couldn't accept
9      because of transportation, correct?
10  A. Yeah, that may be one.
11  Q. And you don't recall where that was, though,
12     right?
13  A. I don't remember.
14  Q. And it was the hours ended at a time where you
15     could not get public transportation, correct?
16  A. In the interview she --
17  Q. Listen, answer my question.
18  A. She knows --
19  Q. Mr. Ayele, you have to answer my question.
20  A. I am answering the question.
21  Q. No, you're not.
22  A. I did.
23  Q. Is it true that you couldn't accept those hours
24     because public transportation was not available

### Page 167

1      to you when the job ended, correct?
2   A. Yes. She knows in the --
3   Q. Is that correct?
4   A. She knows transportation was a problem, too.
5   Q. Is it correct --
6   A. What's correct?
7   Q. Is it correct that you were offered a job that
8      you couldn't accept because public
9      transportation wasn't available at the time the
10     job got out?
11  A. I don't know where -- the job or where the
12     location is, but when she tell me a job that
13     has a different shift or a different area or
14     different branch, I ask the transportation
15     availability. If transportation is not
16     available, it's useless.
17  Q. You can't take it. I've got you. What
18     evidence of discrimination do you have?
19  A. I have a document that employees that they
20     hired after I was interviewed, after I was
21     offered. They offered me the job, and yourself
22     tell the court last week, last two months the
23     job was actually offered, but the company was
24     not able to accommodate. I don't think you can

### Page 168

1      deny that, and the company, they know that, but
2      how a company say we cannot find a job for Mr.
3      Ayele while they hire 364 employees in that
4      period of time. It doesn't make sense.
5   Q. What do you -- so you have documented employees
6      that were hired that you're not going to give
7      to me, right? You are not going to tell me who
8      they are?
9   A. No.
10  Q. That's pretty clear.
11  A. Yes. You file that compelling information.
12  Q. I will file my motion to compel.
13  A. That's not a problem.
14  Q. And you believe that Cognisia made a decision
15     not to hire you?
16  A. What do you call it when a person keeps you six
17     months without offering you the job? They sent
18     me drug test. They scrutinize my background.
19     They check my employment history, and after all
20     this, why employers do not hire you?
21  Q. You were not present in any meetings when
22     Cognisia employees were discussing whether or
23     not to hire you, were you?
24  A. Who discussed?

**Page 169**

1  Q. You weren't present for any meetings where
2     Cognisia -- any Cognisia employees discussed
3     whether to hire you or not, were you?
4  A. To hire me?
5  Q. Yes. You weren't present, were you?
6  A. I was not.
7  Q. So you don't even know what was discussed at
8     any meetings regarding whether or not to hire
9     you, correct?
10 A. But when people send you drug test, send you
11    your criminal background, employment
12    background, after all this and when somebody
13    calls you, okay, I have a job this shift, that
14    means they hire you, in effect.
15 Q. You were never told that your application was
16    rejected, were you?
17 A. I never been told that.
18 Q. Have you described every instance that you
19    believe constitutes discrimination today or are
20    there other acts that you haven't described?
21 A. Well, I was not hired. Dr. Awake was not
22    hired, and the statistics shows only one
23    Ethiopian was hired out of 364, and that person
24    -- and I don't know if he's Ethiopian or not,

**Page 170**

1     but the last name indicates he is an Ethiopian.
2  Q. What name is that?
3  A. Weldebrah something. Just one person what I
4     see.
5           MS. ROBERTS: Can we take a
6     quick break?
7           (Short break was taken.)
8  Q. Can you spell it?
9  A. This is one Ethiopian.
10 Q. You believe that that is an Ethiopian name?
11 A. Maybe, but the first name is not Ethiopian. Is
12    this the only person in the entire 360 people?
13    If you --
14 Q. So just to be clear, you have pointed to a
15    document that we produced in our response to
16    your request for production of documents, and
17    an individual on that list, Keleta Teweldebrah,
18    you believe that's an Ethiopian name?
19 A. It may be.
20 Q. You don't know?
21 A. The last "weldebrah" is Ethiopian.
22 Q. You're basing who was hired and who was not
23    hired -- you're guessing as to their ethnicity
24    based only on their name, correct?

**Page 171**

1  A. The only Ethiopian name that looks like
2     Ethiopian name among the list you give me is
3     that person.
4  Q. So when you say only one Ethiopian out of 364
5     individuals hired, the one Ethiopian, the way
6     you are presuming that there's one Ethiopian is
7     based only on their name; is that correct?
8  A. That's only on name. The rest are not
9     Ethiopians.
10 Q. Now -- you know people can change their name?
11 A. But Ethiopian never change name.
12 Q. An Ethiopian would never change their name?
13 A. I never -- I have been in America 22 years. I
14    never see any Ethiopian changing their name.
15 Q. It's fair to say, though, based on the list
16    that you were just looking at, there's no
17    information about whether that individual is
18    Ethiopian or not nor is there any information
19    regarding the national origin of any of the
20    individuals listed, correct?
21 A. There is no Ethiopian. Even if you take the
22    list of this 99 people you produced, that's a
23    very deceptive document.
24 Q. So your evidence of discrimination was that Mr.

**Page 172**

1     Awake -- Dr. Awake was not hired. You were not
2     hired, and other employees weren't hired, but
3     I'm not allowed to know who they are without
4     moving to compel, right?
5  A. It will be a great mistake if you try to compel
6     me. You will make this case very protracted.
7     Really.
8  Q. So you have a perceived disability claim; is
9     that correct, Mr. Ayele?
10 A. Perceived, yes.
11 Q. What disability do you believe Cognisia
12    perceives that you suffered from?
13 A. They say every time I say -- whenever they say
14    the job require walking and so on and so on and
15    when they know that in my application I also
16    indicated that I don't like to take a walking
17    job, so they perceived as if I was handicapped.
18    I am not a disabled person. Reasonable
19    exercise I can do.
20 Q. Okay.
21 A. Two, one, three times I can make it through.
22    That's not a problem.
23 Q. You have an injured leg, right?
24 A. Injury leg since childhood.

185
1  You keep me 176 days, and that's not fair, and
2  I know you hired other people, and I cannot
3  tolerate this, and I'm going to sue you, and
4  I'm going to file a charge.
5  Q. What -- have you spoken to Jennifer about your
6     case?
7  A. Case in detail?
8  Q. Yes.
9  A. No.
10 Q. What knowledge does Nicole Downes have of the
11    allegations in your case?
12 A. I don't know if she knows until she receives a
13    complaint from the court. I don't know. I
14    don't know if she knows about my charge until
15    she received it from the EEOC.
16 Q. But she knows about your interview?
17 A. She interviews me. She was working with
18    Jennifer about possible location of assignment,
19    what side, what location, and she must have
20    note, but they work together. I don't know
21    about their --
22 Q. What knowledge does Aaron Feo have of the
23    allegations in your complaint?
24 A. I never talked to him.

186
1  Q. But you mentioned him as somebody who might
2     have knowledge of your allegations.
3  A. Yes, because we exchange documents. He is the
4     one who gave an answer for the Commission.
5  Q. And what facts does Mr. Ortiz have regarding
6     the allegations in your case?
7  A. I don't know. If one of the job
8     applications --
9  Q. He checked your --
10 A. Yes, job reference.
11 Q. He checked references.
12 A. It looks like.
13 Q. And Dr. Awake, what facts does he have
14    knowledge of?
15 A. He was there when I was interviewed. He was
16    one of the candidate. In fact, he had --
17    people -- Dr. Awake right there he sense it.
18    He sense it, "Begashaw, I don't think things
19    are going to work," but I was -- I have been in
20    America than him long time. I said, "Let's
21    give them a try." They try to verify,
22    scrutinize, check out background, and
23    everything, and everything, but he says, "I
24    don't believe it."

187
1     From the conversation that
2  transpired in just a half an hour, he
3  understood, "Begashaw, they will not hire us,
4  believe me," but I didn't believe him because
5  some employers takes time, and finally after
6  176 days he proved to me really they didn't
7  hire me.
8  Q. Do you know if Dr. Awake made a claim against
9     Cognisia?
10 A. No, he didn't make.
11 Q. Have you spoken to Dr. Awake about your case?
12 A. Every other weekend even to the recent time.
13 Q. Where does Dr. Awake live?
14 A. He live in Canada now.
15 Q. What part of Canada?
16 A. Ontario.
17 Q. Do you have his address?
18 A. I don't have it now, but I will have it if --
19 Q. Do you know his telephone number?
20 A. I may have, yes.
21 Q. Will you agree to give me his telephone number?
22 A. Why not? If I find it. He may ask maybe to
23    join this lawsuit, too.
24 Q. Are there any other things that Dr. Awake knows

188
1     about regarding the allegations in your
2     lawsuit?
3  A. I don't know. I don't know to what extent, but
4     he was there. He understand it, and he says,
5     This country. We are educated people. He is
6     educated people, honestly, and I seek this job
7     just to survive.
8           My teaching contract was
9     expired. I mean, this is not a military job.
10    It is simply a sitting job down and serve
11    customer. Why not they give us? It's better
12    than to go to Welfare, and he really was deeply
13    disturbed, and only he see things one
14    particular company, but as a nation, why a big
15    nation like this just treat people like this?
16    It may not be the government, but individual
17    people.
18          If individual people mistreat
19    you, challenge them in court. That's my
20    principal. I did it in the past. I will
21    continue to do it. This is a land of justice.
22    I believe somebody made a mistake, it depends
23    on the intentionality or you have to ask.
24          Every people has no obligation

### Page 189

```
 1      to hire anybody, but if you say you have a job,
 2      if you know that person is qualified for the
 3      job, why don't you give them the equal
 4      opportunity?
 5   Q. Are there any other witnesses that you can
 6      think of who have knowledge of facts of your
 7      claims in this lawsuit that you haven't already
 8      mentioned?
 9   A. Not, except the two guys who I interviewed.
10   Q. Those people you are not revealing their
11      identity?
12   A. Yes.  That's the law.  You are a lawyer.  You
13      know that.
14   Q. Other than the documents we've discussed today,
15      are there any other documents that you feel
16      support your allegations?
17   A. I don't know what you are asking me.  So far, I
18      ask you discovery, interrogatory.  You answered
19      me in very elusive, very empty, so --
20   Q. Have you obtained any written or recorded
21      statements?
22   A. No.
23         MS. ROBERTS:  Can we just go off
24      the record.
```

### Page 190

```
 1         (Short break was taken.)
 2   Q. You have not retained -- you have not obtained
 3      any written or recorded statements from any
 4      witnesses?
 5   A. I ask people what happened.  If I have to take
 6      a note, I may take a note.
 7   Q. You have taken your own notes?
 8   A. I never record a paper.
 9   Q. And no one has given you a written statement,
10      no?
11   A. No.
12         MS. ROBERTS:  Well, I am going
13      to suspend this deposition now at 20 minutes of
14      4 because I think that there are facts that Mr.
15      Ayele is not providing specifically he claims
16      are work product privilege for individuals that
17      he has talked to who he claims were hired or
18      have facts regarding his case, and I will move
19      to compel that answer in any -- and reserve the
20      right to take any follow-up deposition
21      questions that relate to that.
22   A. If you have to schedule deposition, I have to
23      know ahead of time because I'm looking some
24      other things to do.  I don't want this
```

### Page 191

```
 1      to create a time conflict.
 2   Q. I will agree to do it at a mutually convenient
 3      time.
 4   A. So today you excuse me?
 5   Q. Today we're suspending.
 6         (Deposition of BEGASHAW AYELE suspended.)
```

### Page 192

```
 1         I hereby certify that I have read the
 2      foregoing deposition transcript of my
 3      testimony, and further certify that said
 4      transcript is a true and accurate record of
 5      said testimony.
 6
 7
 8         _____
 9                BEGASHAW AYELE
10
11
12         Signed under the pains and penalties of
13      perjury this ____ day of _____, 2005.
```

```
1    Commonwealth of Massachusetts
     Suffolk, ss.
2
3        I, Janice A. Maggioli, a Registered
4    Professional Reporter and Notary Public duly
5    commissioned and qualified within and for the
6    Commonwealth of Massachusetts, do hereby
7    certify that there came before me on the 25th
8    day of April 2005 at 10:00 a.m., the person
9    hereinbefore named, who was by me duly sworn to
10   testify to the truth and nothing but the truth
11   of his knowledge touching and concerning the
12   matters in controversy in this cause; that he
13   was thereupon carefully examined upon his oath
14   and his examination reduced to typewriting
15   under my direction; and that the deposition is
16   a true record of the testimony given by the
17   witness. I further certify that I am not
18   interested in the event of the action.
19       IN WITNESS WHEREOF, I have hereunto set my
20   hand and affixed my notarial seal this 2nd day
21   of May 2005.
22
           _____
23              Notary Public
24
```