# EXHIBIT D

DONNA J. MCKENZIE, Plaintiff, v. JOHN E. POTTER, POSTMASTER GENERAL, Defendant.

CIVIL ACTION NO: 02-10727-DPW

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2004 U.S. Dist. LEXIS 17356

August 20, 2004, Decided

**DISPOSITION-1:** Defendant's motion for summary judgment was granted. Plaintiff's cross-motion for summary judgment was denied.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee sued defendant employer, alleging that she was unlawfully discriminated against on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e-2(a), and Mass. Gen. Laws ch. 151B. Additionally, the employee brought a state law claim for intentional infliction of emotional distress as a result of the alleged discrimination. The parties filed cross-motions for summary judgment.

**OVERVIEW:** The employee claimed gender discrimination from multiple causes, including certain remarks, investigations concerning funds received during maternity leave, the denial of mediation, the inexperience of her arbitration attorney, the fact that she had to undergo a fitness exam, and that she was threatened by a supervisor. The court granted the employer's motion. The employee failed to establish an adverse employment action necessary for disparate treatment. She did not show that the denial of mediation was related to, or adversely affected, her employment. There was no actionable sexual harassment to establish constructive discharge. Her job transfer did not involve any reduction in responsibilities. Further, the employee did not establish gender-based harassment for a hostile work environment. Conclusory allegations that male employees were not subjected to similar conduct did not establish this claim. The remarks by two supervisors were not sufficiently severe or pervasive to create an abusive work environment. Although the employee raised a trialworthy issue regarding her emotional distress, there was no evidence that the disputed conduct was sufficiently extreme and outrageous.

**OUTCOME:** The court granted the employer's motion for summary judgment and denied the employee's cross-motion for summary judgment.

**CORE TERMS:** summary judgment, pretext, gender, prima facie case, mixed-motive, harassment, deposition, intentional infliction of emotional distress, hostile work environment, disparate treatment, discriminated, employment discrimination, sexual harassment, subjected, male, local rule, constructive discharge, counterstatement, trialworthy, actionable, nonmovant, state law, cross-motion, supervisor, mediation, movant, privileges of employment, discriminatory intent, direct evidence, record evidence

### LexisNexis(TM) Headnotes

*Civil Procedure > Summary Judgment > Supporting Papers & Affidavits*

[HN1]U.S. Dist. Ct., D. Mass., R. 56.1 requires that opposition to motions for summary judgment shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation. Under the rule, such a failure is grounds to deem admitted the facts in the opponent's Rule 56.1 statement of facts.

*Civil Procedure > Summary Judgment > Supporting Papers & Affidavits*

[HN2]U.S. Dist. Ct., D. Mass., R. 56.1 requires summary judgment movants to include with their motions: a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation. Local Rule 56.1 states that material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN3]Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is "material" if it has the potential to affect the outcome of the suit under the applicable law, and for an issue to be "genuine," the evidence relevant to the issue, viewed in the light most flattering to the non-moving party, must be sufficiently open ended to permit a rational factfinder to resolve the issue in favor of either side.

### Civil Procedure > Summary Judgment > Summary Judgment Standard

[HN4]Cross-motions for summary judgment do not alter the basic summary judgment standard, but rather require courts to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. Thus, in deciding cross-motions for summary judgment, courts must consider each motion separately, drawing inferences against each movant in turn.

### Civil Procedure > Summary Judgment > Supporting Papers & Affidavits

[HN5]The fact that a nonmovant in summary judgment proceedings has failed to submit a counterstatement of facts outlining disputed facts does not alone warrant summary judgment. Even though it deemed movant's facts as admitted, a district court is still obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate. Nor does the failure to submit a counterstatement preclude the nonmovant from offering additional evidence in opposition to summary judgment--it only prevents the nonmovant from disputing the facts in the movant's statement of facts.

### Civil Procedure > Summary Judgment > Burdens of Production & Proof

[HN6]To resist summary judgment successfully, a nonmovant must present "definite, competent evidence" on issues for which she bears the ultimate burden of proof.

### Labor & Employment Law > Discrimination > Actionable Discrimination

[HN7]Where applicable, Mass. Gen. Laws ch. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections.

### Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1964

### Labor & Employment Law > Discrimination > Title VII

[HN8]Section 703 of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000E-2(a)(1), states that it is unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C.S. § 2000e-2(a)(1).

### Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1964

### Labor & Employment Law > Discrimination > Title VII

[HN9]The state law analogue to Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., the Fair Employment Practices Act, Mass. Gen. Laws ch. 151B, states that it is unlawful for an employer in the private sector, by himself or his agent, because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification. Mass. Gen. Laws ch. 151B §. 4(1)(B). For cases arising under ch. 151B, Massachusetts courts have adopted the well-established analytical framework used in federal employment discrimination cases arising under Title VII.

### Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis

[HN10]Under the analytical framework set forth for Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. 2000e et seq., cases, a court can analyze a disparate treatment case in one of two ways: The first uses the burden-shifting "pretext" framework set forth in McDonnell Douglas Corporation v. Green. The second involves the so-called "mixed-motive" analysis established in Price Waterhouse v. Hopkins.

### Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis

[HN11]The pretext framework involves a three-stage analysis consisting of a shifting allocation of evidentiary burdens. An employee in the first instance must demonstrate that (1) she is a member of a protected class; (2) the employer took an adverse employment action against her; (3) she was qualified for the employment she held; and (4) her position remained open or was filled by a person whose qualifications were similar to hers. If the employee can establish a prima facie case, a burden of production shifts in the second stage of the analysis to the

employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action, by identifying enough admissible evidence to support a rational finding that unlawful discrimination was not the cause of the employment action. In the third and final stage of the pretext analysis, if the employer proffers a legitimate, nondiscriminatory reason, the burden shifts back to the employee who bears the ultimate burden of proof of showing that the employer intentionally discriminated against her on the basis of gender, and she can do so by showing that the employer's proffered explanation is unworthy of credence.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*

*Labor & Employment Law > Discrimination > Retaliation*

[HN12]Just as with a disparate treatment claim, to prevail on a retaliation claim, a plaintiff must demonstrate that she suffered an adverse employment action.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*

*Labor & Employment Law > Discrimination > Actionable Discrimination*

[HN13]Adverse employment actions in the context of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., include demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees. Moreover whether an employment action is "adverse"--and therefore actionable under Title VII--is gauged by an objective standard. Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action. Typically, for an adverse employment action to lie, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*

*Labor & Employment Law > Discrimination > Actionable Discrimination*

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*

*Labor & Employment Law > Wrongful Termination > Constructive Discharge*

[HN15]A constructive discharge can ground an employment discrimination claim.

*Labor & Employment Law > Wrongful Termination > Constructive Discharge*

*Labor & Employment Law > Discrimination > Sexual Harassment > Hostile Work Environment*

[HN16]A hostile-environment-based constructive discharge claim stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*

*Labor & Employment Law > Discrimination > Actionable Discrimination*

[HN17]Certainly if an employee suddenly finds herself with dramatically decreased supervisory authority and without a voice in major decisions, this could constitute an adverse employment action, but when a general reorganization results in some reduction in job responsibilities without an accompanying decrease in salary, or grade, those changes cannot be dubbed adverse employment actions.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*

*Labor & Employment Law > Discrimination > Actionable Discrimination*

[HN18]"Bald assertions" that employees were excluded from important meetings and experienced diminished communications regarding office matters are insufficient evidence of a material change in working conditions.

*Labor & Employment Law > Discrimination > Sexual Harassment > Hostile Work Environment*

[HN19]To succeed on a hostile work environment claim, a plaintiff must demonstrate: (1) that she, or he, is a member of a protected class; (2) that she was

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*

*Labor & Employment Law > Discrimination > Actionable Discrimination*

[HN14]A plaintiff in a employment discrimination case must demonstrate the ability to establish by a preponderance of the evidence, and not merely claim, a "prima facie" case of unlawful discrimination. A plaintiff must introduce sufficient competent evidence to establish prima facie claims. Thus, it is not enough that a plaintiff merely assert that she has suffered an adverse employment action; she must produce evidence to support the assertion.

subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

### Torts > Intentional Torts > Intentional Infliction of Emotional Distress

[HN20]To prevail on a claim for intentional infliction of emotional distress, a plaintiff must establish (1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.

### Torts > Intentional Torts > Intentional Infliction of Emotional Distress

[HN21]Liability for intentional infliction of emotional distress cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions or other trivialities.

**COUNSEL:** [*1] For Donna J. McKenzie, Plaintiff: Donna J. McKenzie, Pro Se, Marshfield, MA. George E. Brankey, George E. Brankey, Esq., Boston, MA.

For John E. Potter, Defendant: Mark J. Grady, United States Attorney's Office, Boston, MA.

**JUDGES:** DOUGLAS P. WOODLOCK, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** DOUGLAS P. WOODLOCK

**OPINION:** MEMORANDUM AND ORDER

In this action, plaintiff Donna McKenzie alleges that she was unlawfully discriminated against in her employment with the United States Postal Service ("USPS") on the basis of gender in violation of both federal and state law. Additionally, she brings a state law claim for intentional infliction of emotional distress as a result of the alleged discrimination. Defendant John Potter, Postmaster General of the USPS, has moved for summary judgment, and McKenzie has cross-moved for summary judgment. For the reasons stated more fully below, I will grant

summary judgment in favor the defendant. While the record suggests lamentable lapses in sound management practices on the part of the USPS, there is insufficient evidence to support the claims of gender discrimination or intentional infliction of emotional distress.

## I. BACKGROUND

While Potter has, [*2] pursuant to Local Rule 56.1, filed a statement of undisputed facts to accompany his motion for summary judgment, n1 McKenzie has failed entirely to comply with that rule, [HN1]which requires that "opposition to motions for summary judgment shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation." Under the rule, such a failure is grounds to deem admitted the facts in Potter's 56.1 statement of facts, n2 see Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003), and I do so here. n3 Rather than rehearse the facts admitted for purposes of the pending motions, I simply incorporate by reference Potter's Rule 56.1 statement.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 Local Rule 56.1 [HN2]requires summary judgment movants to include with their motions:

a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation.

[*3]

n2 Specifically, Local Rule 56.1 states that "material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."

n3 McKenzie has also failed to submit her own Rule 56.1 statement of facts in connection with her cross-motion for summary judgment.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

## II. DISCUSSION

## A. Standard of Review

[HN3]Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law," Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000), and for an issue to be "genuine," the evidence relevant [*4] to the issue, viewed in the light most flattering to the non-moving party, must be "sufficiently open -- ended to permit a rational factfinder to resolve the issue in favor of either side." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n4 [HN4]Cross-motions for summary judgment do not alter the basic summary judgment standard, but rather require courts to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. See Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103 (1st Cir. 2001); Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996). Thus, in deciding cross-motions for summary judgment, courts must consider each motion separately, drawing inferences against each movant in turn. Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

Because McKenzie has failed to provide a counterstatement of facts under Local Rule 56.1, I [*5] have deemed admitted Potter's statement of facts. McKenzie's failure to provide a counterstatement of facts has thus put her in a position from which it will be difficult, though not impossible, for her to forestall summary judgment because the record now favors Potter. See Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) ("The decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence.").

To be sure, [HN5]the fact that a nonmovant in summary judgment proceedings has failed to submit a counterstatement of facts outlining disputed facts does not alone warrant summary judgment. Id. (even though it deemed movant's facts as admitted, district court was "still obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate"). Nor does the failure to submit a counterstatement preclude the nonmovant from offering additional evidence in opposition to summary judgment -- it only prevents the nonmovant from disputing the facts in the movant's statement of facts. See Euromodas, Inc. v. Zanella, Ltd., 368 F.3d 11, 15-16 (1st Cir. 2004) [*6] (construing analogous local rule in District of Puerto Rico).

However, [HN6]to resist summary judgment successfully, a nonmovant must present "definite, competent evidence" on issues for which she bears the ultimate burden of proof, Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991), cert. denied, 504 U.S. 985, 119 L. Ed. 2d 586, 112 S. Ct. 2965 (1992), and here, the only substantive record evidence McKenzie has offered as to any of her claims, n5 other than the conclusory allegations in her briefs, is in exhibits accompanying the memorandum. These, however, do not comply with Fed. R. Civ. P. 56 (e). Thus, if Potter here can make a preliminary showing that no genuine issue of material fact exists, summary judgment is appropriate given McKenzie's failure even to attempt to identify in proper form specific facts demonstrating a trialworthy issue. See Calero-Cerezo v. United States Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

- - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n5 McKenzie has submitted an affidavit with attachments in support of her cross-motion for summary judgment, but those materials do not directly address the substance of her claims. I below consider whether they are sufficient to prevent summary judgment.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[*7]

## B. Gender Discrimination

In Count I of her complaint, McKenzie alleges that she was sexual harassed and discriminated against on the basis of gender in violation of both state law n6 and § 703 of Title VII, 42 U.S.C. § 2000e-2(a). n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

2004 U.S. Dist. LEXIS 17356

n6 In her complaint, McKenzie lists chapters 151B § 4(1), 93 § 102, 214 § 1C, and 12 § 11I of Mass. Gen. Laws as the bases for her discrimination claims. In Charland v. Muzi Motors, Inc., 417 Mass. 580, 631 N.E.2d 555 (1994), however, the Supreme Judicial Court held that [HN7]"where applicable, G.L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections." Id. at 586; see Clarke v. Kentucky Fried Chicken, 57 F.3d 21, 27 (1st Cir. 1995) (extending Charland to chapter 214 § 1st Cir.). Because McKenzie alleges in her complaint that the USPS discriminated against her on the basis of sex "with respect to compensation, terms, conditions or privileges of employment," Amended Complaint P 23, Charland applies, and thus, McKenzie's sole state law cause of action in Count I is under Mass. Gen. Laws ch. 151B.

[*8]

n7 In her complaint, McKenzie mentions the Rehabilitation Act of 1973 as a basis for jurisdiction in the federal district court. In detailing the substantive causes of action, however, she mentions only alleged discrimination on the basis of gender, not disability. Moreover, she has adduced no evidence whatsoever that she was discriminated on the basis of disability, and thus any claims under the Rehabilitation Act would not survive summary judgment even if McKenzie had properly raised and pursued them.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

As a basis for her claims, McKenzie identifies the following as evidence of discrimination on the basis of gender: (1) certain gender specific remarks were made to her; (2) five separate investigations were carried out concerning McKenzie's receipt of excess funds during her maternity leave, and the conduct of the investigations was not equivalent as to her and a male coworker subject to investigation; (3) she was denied a request for mediation; (4) an attorney handling an arbitration matter was replaced by an attorney who McKenzie claims had insufficient experience; (5) she was ordered to undergo [*9] a fitness for duty exam; (6) she was dropped as a particular supervisor's "protege" in the USPS's mentoring program; (7) she

was threatened by another supervisor; and (8) her FIOA requests were not adequately met.

While McKenzie did not made explicit, either in her complaint or her summary judgment filings, the precise theory of liability under which she pursues her claims as gender discrimination, I will analyze them as both disparate treatment claims and as hostile work environment claims. n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 In his memorandum supporting his motion for summary judgment, Potter addressed both types of claims; in her opposition, McKenzie did not offer any additional theories of liability.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

1. Disparate Treatment

Section 703 of Title VII [HN8]states that it is unlawful for an employer

to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, [*10] sex, or national origin. 42 U.S.C. § 2000e-2(a)(1).

[HN9]The state law analogue to Title VII, the Fair Employment Practices Act codified at Mass. Gen. Laws ch. 151B ("chapter 151B") states that it is unlawful for an employer

in the private sector, by himself or his agent, because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification. Mass. Gen. Laws ch. 151B § 4(1)(B).

For cases arising under chapter 151B, Massachusetts courts have adopted the well-established analytical framework used in federal employment discrimination cases arising under Title VII. See Wynn & Wynn, P.C. v. Mass. Comm'n Against Discrimination, 431 Mass. 655, 729 N.E.2d 1068 (2000), overruled on other grounds by Stonehill College v. Mass. Comm'n Against Discrimination, 441 Mass. 549, 562, 808 N.E.2d 205(2004). The parties here have framed their legal memorandum under the standards set forth in the federal case [*11] law, and for ease of discussion (while recognizing that in certain respects not material here the federal law and the state laws of employment

discrimination are not equivalent), I follow their lead in this discussion.

[HN10]Under the analytical framework set forth for Title VII cases, a court can analyze a disparate treatment case in one of two ways: The first uses the burden -- shifting "pretext" framework set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981). See Weston-Smith v. Cooley Dickinson Hosp., Inc., 282 F.3d 60, 64 (1st Cir. 2002). The second involves the so-called "mixed-motive" analysis established in Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989). See Weston-Smith, 282 F.3d at 64. Here, Potter argues that the McDonnell Douglas-Burdine pretext framework applies, and McKenzie does not contend otherwise. Thus, I will apply the pretext analysis. n9 See Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 31 (1st Cir. 2003) [*12] (noting in dicta that plaintiff never suggested in district court that he was presenting mixed-motive case).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n9 I note that the Supreme Court's decision in Desert Palace, Inc. v. Costa, 539 U.S. 90, 156 L. Ed. 2d 84, 123 S. Ct. 2148 (2003), which held that direct evidence of discrimination is not required to establish liability in a mixed-motive Title VII case, id. at 101-02, has created some uncertainty about the appropriateness of applying the McDonnell Douglas pretext framework in Title VII cases. Prior to Desert Palace, the choice of analysis -- "pretext" or "mixed-motive" -- depended on the type of evidence the plaintiff offered to prove discriminatory intent. Weston-Smith, 282 F.3d at 64. If the plaintiff could demonstrate some direct evidence of discriminatory intent, the latter applied, but if the plaintiff could muster only indirect, circumstantial evidence of discrimination the former applied. Id. Because Desert Palace essentially eliminates direct evidence as a prerequisite for mixed-motive analysis, it is unclear what should now determine whether pretext or mixed-motive analysis should apply in a given case -- or whether pretext analysis has even survived the decision. This uncertainty has led to several different responses among the various lower courts.

See generally Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc., 285 F. Supp. 2d 1180, 1192-95 (N.D. Iowa 2003) (summarizing responses of lower courts to Desert Palace). The First Circuit has not resolved the issue, but it has hinted that pretext is still a viable mode of analysis. See Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 31 n.3 (1st Cir. 2003) (noting that the Supreme Court itself has used pretext analysis in a post-Desert Palace case). In any event, whether pretext analysis is still available does not affect the outcome of this case because, as discussed below, my decision to grant summary judgment as to the disparate treatment claims is based on McKenzie's inability to demonstrate that she suffered an adverse employment action, which she would have to show even under mixed-motive analysis. See Hillstrom, 354 F.3d at 31 ("Even in mixed-motive cases, plaintiffs must present enough evidence to permit a finding that there was differential treatment in an employment action.").

- - - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

[*13]

[HN11]The pretext framework involves a three-stage analysis consisting of a shifting allocation of evidentiary burdens, Reeves v. Sanderson Plumbing Prods., Inc. 530 U.S. 133, 142, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000). Applying that framework here, McKenzie in the first instance must demonstrate that (1) she is a member of a protected class; (2) the USPS took an adverse employment action against her; (3) she was qualified for the employment she held; and (4) her position remained open or was filled by a person whose qualifications were similar to hers. See Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001).

If McKenzie can establish a prima facie case, a burden of production shifts in the second stage of the analysis to Potter to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action, McDonnell Douglas, 411 U.S. at 802, by "identifying enough admissible evidence to support a [rational] finding that unlawful discrimination was not the cause of the employment action.'" Straughn, 250 F.3d at 33 (quoting Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)). [*14]

In the third and final stage of the pretext analysis, if Potter proffers a legitimate, nondiscriminatory reason, the burden shifts back to McKenzie who bears the ultimate burden of proof of showing that the USPS intentionally discriminated against her on the basis of gender, and she can do so by "by showing that the employer's proffered explanation is unworthy of credence." Reeves, 530 U.S. at 143 (2000).

McKenzie spends much of her briefing on the present motions by arguing that she has made a sufficient showing that Potter's explanations for the USPS's conduct were pretextual. n10 In doing so, however, she has put the cart before the horse because she has not sufficiently made out a prima facie case by establishing that she suffered an adverse employment action. n11

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n10 I note that while I need not fully reach the question, I find McKenzie's arguments concerning pretext unpersuasive. While she has argued, without an adequate record basis, that her quondam supervisor Pento was manipulating but covering up the instances of gender based discriminatory activity, I find the argument wholly speculative. McKenzie also contends that efforts on the part of Potter's counsel to supplement or alter responses to interrogatories somehow show that the stated reasons for USPS conduct involved pretext for discrimination. Even accepting McKenzie's argumentative characterizations, I do not find such a connection can be made. In any event, I do not accept the characterizations; I disagree with the suggestion that Potter's counsel's attempts to change the interrogatory responses were made in bad faith or that any inconsistencies between the interrogatories and deposition testimony constitute either evidence of pretext or sanctionable conduct in this case.

[*15]

n11 In her deposition, McKenzie alluded to claims for retaliation for filing an administrative employment discrimination action. She has neither properly pled such claims, nor has she addressed them in any of her filings. In any event, even had she properly pursued such claims, they would suffer the same fate as her disparate treatment claims because,[HN12] just as

with a disparate treatment claim, to prevail on a retaliation claim, a plaintiff must demonstrate that she suffered an adverse employment action. See Gu v. Boston Police Dep't, 312 F.3d 6, 13-14 (1st Cir. 2002).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

As the First Circuit has explained, [HN13]adverse employment actions in the context of Title VII include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998). Moreover whether an employment action is "adverse" - - and therefore actionable under Title VII -- is gauged by an objective standard. Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 23 (1st Cir. 2002); [*16] see Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996) ("Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action."). Typically, for an adverse employment action to lie, "the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service." Blackie, 75 F.3d at 725-26 (citations omitted).

McKenzie contends that to establish a prima facie case, all she is required to do is to "make claim" that she has suffered an adverse action. Plaintiff's Memorandum in Opposition to Summary of Judgment, at 4. Thus, she argues that allegations that she made in administrative proceedings that she was "bypassed for a promotion by a man" are sufficient to make out a prima facie case. Id. She further [*17] argues that the denial of her right to mediation constituted an actionable adverse employment decision for purposes of establishing a prima facie case. Id. at 4-5.

As an initial matter, McKenzie misunderstands the burdens involved in the pretext analysis. As the Supreme Court has stated, [HN14]a plaintiff in a employment discrimination case must demonstrate the ability to establish by a preponderance of the evidence (and not merely claim) a "prima facie" case of unlawful discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S.

Ct. 2742 (1993); see also Straughn, 250 F.3d at 33 (plaintiff must introduce "sufficient competent evidence to establish prima facie claims"). Thus, it is not enough that McKenzie merely assert that she has suffered an adverse employment action; she must produce evidence to support the assertion. McKenzie's passing reference in her opposition brief to the allegations she made in an affidavit during administrative proceedings is not enough to create a trialworthy question as to whether the USPS failed to promote her -- especially given that she has not even offered the affidavit as evidence in this case. [*18]

As for the denial of mediation, even if she were entitled to mediation-which she has not established in the record -- McKenzie has not sufficiently established that except that it arose in the employment context the denial was related to her employment, much less that it adversely affected her in her employment. Her conclusory allegations that the denial amounted to withholding of an "accouterment of the employment relationship" is not sufficient to make out a prima facie case.

McKenzie's contention that the alleged sexual harassment she endured in her employment constituted constructive discharge does not alter the conclusion that she has failed to make out a prima facie case. While it is true that[HN15] a constructive discharge can ground an employment discrimination claim, see Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000), McKenzie, as discussed infra, has not offered sufficient evidence of actionable sexual harassment on the part of the USPS or its agents to establish a constructive discharge. Thus, it follows almost axiomatically that McKenzie cannot demonstrate that she was constructively discharged as a result of a gender based hostile work environment. [*19] See Pennsylvania State Police v. Suders, 159 L. Ed. 2d 204, 124 S. Ct. 2342, 2354 (2004) [HN16](hostile-environment-based constructive discharge claim "stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment").

Finally, one additional matter pertaining to the adverse employment action issue warrants brief discussion. Though she does not mention it in her summary judgment filings, McKenzie indicated in her deposition testimony that following her maternity leave, she was transferred to a different position with lesser responsibilities. However, upon further questioning, McKenzie testified that her position remained essentially equivalent after the transfer: her wage was not changed and she even agreed that the substantive responsibilities in her new position were not lesser than in her previous position. While the First Circuit

has stated that [HN17]"certainly if an employee suddenly finds herself with dramatically decreased supervisory authority and without a voice in major decisions, this could constitute an adverse employment action," Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002), it elaborated in the [*20] same case that "when a general reorganization results in some reduction in job responsibilities without an accompanying decrease in salary, or grade, those changes cannot be dubbed adverse employment actions." Id.

McKenzie does not contend that her transfer involved any actual reduced responsibilities entailed in her position. Rather, it is clear from McKenzie's deposition that her assertion that she was transferred to a position of lesser responsibility was based on her contention that, because of the ongoing investigations of her by the USPS, certain of her supervisees countermanded her authority. Such unsupported allegations are not sufficient to establish an adverse employment action. See id. at 15 ([HN18]"bald assertions" that plaintiffs were excluded from important meetings and experienced diminished communications regarding office matters were "insufficient evidence of a material change in working conditions").

I thus conclude that McKenzie has failed to establish a prima facie case of discrimination on the basis of gender because she has failed to demonstrate a trialworthy issue as to whether she suffered an adverse employment action during her employment with [*21] the USPS. n12

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n12 Because I conclude that summary judgment is warranted on the merits, I need not reach the question whether McKenzie satisfied the administrative timely-filing requirements associated with Title VII.

- - - - - - - - - - - - End Footnotes- - - - - - - -

## 2. Hostile Work Environment

[HN19]To succeed on a hostile work environment claim, a plaintiff must demonstrate:

(1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an

abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001). I conclude **[*22]** that McKenzie has not sufficiently demonstrated that she satisfies the elements of this test.

To start, except for the remarks by Marinelli and Pento, McKenzie has not demonstrated that the conduct she identifies as harassment was directly based on gender. The bulk of McKenzie's allegations that the alleged harassment was based on gender rests on her contention that she was subjected to treatment that male employees were not. For instance, she contends that the USPS's various investigations of her receipt of excess salary payments during her maternity leave constituted gender based harassment because the investigations did not equally implicate Powers. The following exchange during her deposition is illustrative:

A And specifically, regarding the question that you asked on how I felt I was discriminated against during that investigation and through the investigation is directed right on the front page --

Q Could you explain for me how that --

A -- the investigation. It says, "The subject is Donna McKenzie, allegations of misconduct".

Q And you believe that's discriminatory?

A Absolutely.

Q Can you describe for me how that is discriminatory?

A. **[*23]** It doesn't say "allegations" or "misconduct" on Mr. Mike Powers and Supervisor Donna McKenzie. It specifically states just me, who is a female and not Mr. Powers, the male.

McKenzie Deposition, at 68.

McKenzie's contention that the investigations should have been equally directed at Powers because the anonymous letter implicated them equally is unpersuasive. Though the letter certainly indicates that Powers might be engaged in inappropriate conduct, the letter is clearly and fundamentally directed at McKenzie. In any event, the mere absence of Power's name on the investigation report is insufficient to demonstrate that the investigations constituted harassment based on gender.

McKenzie has offered no record evidence to substantiate her allegation that any of the conduct (other than the statements by Marinelli and Pento) which she claims as harassment was based on gender. Thus, while she complains of myriad wrongs -- inter alia, being subjected to the investigations, having her request for mediation denied, having her Privacy Act rights violated, getting dropped in the Protege program -- she has not shown that the conduct of the USPS or its agents was based on gender. **[*24]** Her conclusory allegations that no male employee had ever been subjected to similar treatment or, in the case of the investigation, other male employees should have been subjected to similar treatment are not sufficient to withstand summary judgment.

As for the comments by Marinelli and Pento, they were clearly gender specific, but I find that do not constitute actionable sexual harassment. Although quite offensive in nature, they are not enough for a reasonable jury to find that they constitute evidence of conduct sufficiently "severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment." O'Rourke, 235 F.3d at 728. McKenzie's attempt to tie Pento to the remaining conduct of which she complains and thereby imbue the latter with discriminatory intent is unpersuasive and not supported by record evidence.

Accordingly, I conclude that summary judgment is warranted as to the hostile work environment claims.

**C. Intentional Infliction of Emotional Distress**

[HN20]To prevail on a claim for intentional infliction of emotional distress, a plaintiff must establish "(1) that the defendant intended to inflict emotional **[*25]** distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it." Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466, 681 N.E.2d 1189 (1997) (quoting Payton v. Abbott Labs, 386 Mass. 540, 555, 437 N.E.2d 171 (1982)).

After evaluating McKenzie, Dr. Land concluded that McKenzie was unfit for duty because she had "adjustment disorder" which could be traced back to her difficulties during her employment with the USPS, and he further stated that she may have been suffering from an "episode of Major Depression." Dr. Land's report is sufficient to create a trialworthy issue as to both the severity of McKenzie's emotional distress and whether her distress was caused by the USPS.

However, McKenzie has failed to adduce sufficient evidence that any of the actions of the USPS [*26] or any of its agents were intended to cause emotional distress or reasonably likely to cause emotional distress. Moreover, none of the conduct about which McKenzie complains can fairly be characterized as "extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community." Tetrault, 425 Mass. at 466. While the vulgarities by Marinelli and the statement by Pento were certainly offensive, [HN21]liability for intentional infliction of emotional distress cannot be predicated on "mere insults, indignities, threats, annoyances, petty oppressions or other trivialities." Id. at 466 (quoting Foley v. Polaroid Corp., 400 Mass. 82, 99, 508 N.E.2d 72 (1987)). Thus, I find that no reasonable jury could conclude that the USPS or its agents engaged in conduct that would satisfy the elements necessary to prevail on a claim of intentional infliction of emotional distress, and accordingly, I will grant summary judgment for Potter as to the claim.

### III. CONCLUSION

For the reasons set forth more fully above, Potter's motion for summary judgment is GRANTED, and McKenzie's cross-motion for summary judgment is DENIED. [*27]

DOUGLAS P. WOODLOCK

UNITED STATES DISTRICT JUDGE

**MANUEL GALVAO, Plaintiff, Appellant, v. THE GILLETTE COMPANY, Defendant, Appellee. Coffin and Bownes,**

### No. 96-2062

### UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

*1997 U.S. App. LEXIS 21255*

**August 12, 1997, Decided**

**NOTICE:** [*1] RULES OF THE FIRST CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Certiorari Denied February 23, 1998, Reported at: *1998 U.S. LEXIS 1359.* Reported in Table Case Format at: *1997 U.S. App. LEXIS 40725.*

**PRIOR HISTORY:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS. Hon. Douglas P. Woodlock, U.S. District Judge.

**DISPOSITION:** Affirmed.

**LexisNexis(R) Headnotes**

**COUNSEL:** Mark F. Itzkowitz for appellant.

Richard P. Ward with whom Bonnie B. Edwards was on brief for appellee.

**JUDGES:** Before Selya, Circuit Judge, Senior Circuit Judges.

**OPINIONBY:** COFFIN

**OPINION:** COFFIN, Senior Circuit Judge. Appellant Manuel Galvao, a black Cape Verdean male, contends that the district court erred in dismissing his federal and state discrimination and retaliation claims against his former employer, the Gillette Company ("Gillette"). n1

He also maintains that the district court erred in denying his former counsel's motion to withdraw. We affirm.

> n1 Galvao specifically claims that it was Gillette as a corporate entity, and not any specific individuals there, who discriminated against him.

[*2]

FACTS

We recite the facts in the light most favorable to the party opposing summary judgment. See *Fennell v. First Step Designs, Ltd., 83 F.3d 526, 534 (1st Cir. 1996).* The incidents underlying this case began in approximately 1989, when Galvao was working in the Boston Research and Development Division (BRAD) of Gillette as a Grade 7 technician. He sought a promotion or upgrade of his job classification, which was denied. n2 Instead, Gillette supervisors presented Galvao with a Career Development plan designed to qualify him for promotion to a Grade 8 position. On Galvao's protest, an audit of his position was performed by the Gillette Human Resources Compensation Department, which concluded that his position was properly graded. Galvao sought and received a review of the audit by Gillette's Open Door Review Panel, which also upheld the denial of the upgrade. n3

> n2 There seems to be some confusion as to whether the change sought was a promotion or a regrading of Galvao's existing job. Indeed, Galvao himself testified in his deposition that he was unclear as to the distinction between the two. The issue is irrelevant to our analysis, however, since Galvao is unable to show that there were

1997 U.S. App. LEXIS 21255, *

others similarly situated for either circumstance. [*3]

n3 The Panel was composed of Doris Ferrer Roach, an attorney in Gillette's General Counsel's Office and a Hispanic female; Timothy W. Horan, Director of Human Resources-Manufacturing, a white male; and Robert A. Williams, III, Vice President, Corporate Director, Urban Affairs, a black male.

In July 1992, Galvao filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD"), alleging that he had been denied a promotion and given a negative performance evaluation due to his race, color and national origin. He maintains that after his filing, his supervisors distanced themselves from him, and subjected him to greater criticism and demands. He was assigned to a new supervisor, Dr. Hoang Mai Trankiem, in February 1993. n4 Although Trankiem and Galvao initially had a positive relationship as a result of an in-house project they had previously worked on together, relations between them rapidly deteriorated. Trankiem instituted a system of daily worksheets and productivity reports on Galvao, and, according to him, exerted tremendous pressure on him, with the result that he felt [*4] increasingly stressed. Despite repeated requests by Galvao to both Trankiem and her supervisor, Dr. Stan Wreford, for intervention vis a vis his working responsibilities and Trankiem's supervision of him, no help was forthcoming. n5 Rather, Galvao was eventually provided with a Final Written Warning, n6 and then terminated on November 8, 1993. He subsequently filed suit, bringing both federal and state discrimination and retaliation claims. The district court granted summary judgment for Gillette, and this appeal followed.

n4 Dr. Trankiem is a Vietnamese female. Trankiem testified in her deposition that she requested she supervise Galvao in an effort to improve his productivity, which had become a source of concern under a previous supervisor.

n5 In one memo to Dr. Wreford, Galvao described Dr. Trankiem's management style as "Vietnamese" and said he was being subjected to psychological torture and treated like a prisoner or a slave.

n6 As part of his Final Written Warning, Galvao was upgraded to Grade 8 by Dr. Trankiem in an effort to remove a perceived barrier to his productivity.

[*5]

## DISCUSSION

We review the district court's grant of summary judgment de novo. See *Mesnick v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1992).* In so doing, we have thoroughly reviewed the record and the briefs, and find ourselves in accord with the district court's conclusions. Mindful that where a district court has produced a comprehensive, well-reasoned opinion, we should not needlessly expound at length, we discuss each of Galvao's claims briefly. See *Lawton v. State Mut. Life Assur. Co. of America, 101 F.3d 218, 220 (1st Cir. 1996).*

1.Title VII Discrimination.

Under the well-established McDonnell Douglas framework for Title VII cases, see *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); see also Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 420 (1st Cir. 1996),* a plaintiff seeking to prove discrimination without direct evidence of bias must first establish a prima facie case of discrimination. See *Lattimore v. Polaroid Corp., 99 F.3d 456 (1st Cir. 1996).* n7 This is accomplished by showing that the employee is a member of a protected class and that similarly situated employees who were not members of the class were treated [*6] more favorably. See id. If such a showing is made, the burden then shifts to the employer to articulate a legitimate non-discriminatory reason for its actions. See id. Once this is accomplished, the employee may then attempt to prove that the proffered reason is a pretext. See id. n8

n7 Cases decided under the ADEA (Age Discrimination in Employment Act, *29 U.S.C. § § 621-*634) are applicable in the Title VII context, see *Fennell, 83 F.3d at 535 n. 9,* and we therefore cite to cases of both types for purposes of the McDonnell-Douglas analysis.

n8 The district court concluded this was a "non-competitive promotion" case (rather than what it termed a "garden variety" failure to promote case), and therefore adopted a modification promulgated in a district court case in Tennessee, *Young v. State Farm Mut. Auto. Ins. Co., 868 F. Supp. 937, 944-45 (W.D. Tenn. 1994).* As both the "garden variety" and "non-competitive promotion" analyses require a plaintiff to address the key issue here -- i.e. whether the plaintiff is treated differently from others similarly situated -- we do not for the

present distinguish between non-competitive promotion and other failure to promote cases.

[*7]

The district court found that Galvao had failed to show that there were similarly situated employees who could be used as a basis of comparison. We see no flaw in its reasoning. The employees identified by Galvao either were not in the same grade as him, or they worked in different areas.

We recently cautioned that courts must exercise particular care when evaluating a plaintiff's claim that an employer applied its standards differentially (i.e., distinguished between the plaintiff and those similarly situated). See *E.E.O.C. v. Amego, Inc., 110 F.3d 135, 145 (1st Cir. 1997)*(citing *Banerjee v. Board of Trustees, 648 F.2d 61, 63 (1st Cir. 1981)*)(in academic tenure context, plaintiffs who were denied tenure must show that their qualifications are at least comparable to those of "a middle group of tenure candidates as to whom both a decision granting tenure and a decision denying tenure could be justified as a reasonable exercise of discretion by the tenure-decision making body"). A plaintiff must be able, at a minimum, to demonstrate that there are at least some basically comparable employees. Galvao was unable to do this.

Although the district court's finding that Galvao [*8] had failed to make out a prima facie case made it unnecessary to continue the McDonnell Douglas analysis, the district court went on to find that Gillette's proffered reason for not upgrading Galvao -- that he lacked the credentials and characteristics of a Grade 8 technician -- was not a pretext. The district court thoroughly addressed the evidence on this issue, and we need not repeat it. We agree that, on this record, a jury could not conclude that Gillette's reasons were pretextual, and Galvao's Title VII discrimination claim therefore fails.

2. Title VII Retaliation.

Galvao also contends that the district court erred in dismissing his separate claim that Gillette retaliated against him for filing the MCAD complaint. He asserts that his supervisor subjected him to undue supervision and assessment, and ultimately terminated him in response to his administrative claim.

The McDonnell Douglas burden shifting analysis is also used in retaliation claims where there is no direct evidence of a defendant's retaliatory animus. See *Fennell, 83 F.3d at 535*. A plaintiff seeking to show a prima facie case of retaliation under Title VII must show 1) he or she engaged in [*9] protected conduct under Title VII and that the alleged retaliator was aware of it,

2) an adverse employment action, and 3) a causal connection between the first two elements. See id.; see also *Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 33 (1st Cir. 1990)*. Once this showing has been made, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for its employment decision. See *Fennell, 83 F.3d at 535*.

Even given a generous reading, Galvao's retaliation claim falters. While he can establish that he engaged in protected conduct -- the filing of the MCAD complaint -- he has failed to show that Gillette personnel knew about this at the time of the allegedly adverse employment actions, or that there was a causal relationship between his filing his MCAD complaint and the challenged conduct. As the district court explained, the record shows that the adverse employment actions of which he complains, including his termination, were the result of his own poor performance and insubordination.

3. Motion of Counsel to Withdraw.

Galvao also contends that the district court erred in denying his previous counsel's motion to withdraw. He [*10] argues that the court's ruling compelled him to continue with counsel in whom he had lost faith, and whose commitment to his case he doubted, and that his case was thereby prejudiced. Under Local Rule 83.5.2(c), because successor counsel had not been obtained by Galvao, it was within the court's discretion whether to grant his counsel's motion to withdraw. n9 In the circumstances, we cannot say that the court's refusal to do so was an abuse of discretion. See *Andrews v. Bechtel Power Corp., 780 F.2d 124, 135 (1st Cir. 1985)*. Title VII litigation is complex and a pro se litigant embarks on this path with some significant disadvantage. The court's conclusion that Galvao was better off with counsel, even if they were not exactly seeing eye to eye, was not an unreasonable one. Moreover, the court indicated that it would be willing to reconsider the issue later. Furthermore, although we realize that a serious difference existed between Galvao and his counsel, it appears from the record that the district court made every effort to permit Galvao to present his case as he wished. n10

n9 Rule 83.5.2(c) states:

An attorney may withdraw from a case by serving notice of his withdrawal on his client and all other parties and filing the notice, provided that (1) such notice is preceded or accompanied by notice of the appearance of other counsel; (2) there are no motions

1997 U.S. App. LEXIS 21255, *

pending before the court; (3) no trial date has been set; and (4) no hearings or conferences are scheduled, and no reports, oral or written, are due. Unless these conditions are met, an attorney (including one whose services have been terminated by his client) may withdraw from a case only by leave of court.

[*11]

n10 In a pretrial hearing, the district court specifically informed Galvao that he had instructed his counsel that in any situation where a difference arose between Galvao and counsel as to the presentation of arguments, Galvao's counsel should present it both in the form that Galvao wished and in the form that counsel's legal judgment suggested.

Additionally, Galvao's counsel was bound by an ethical obligation to prosecute his case fully and effectively. See *Hammond v. T.J. Little, 809 F. Supp. 156, 159 (D.Mass. 1992)*. Galvao maintains that his counsel failed to do so because she did not present various documents obtained during the course of discovery to the court which he alleges would have bolstered his case. We decline Galvao's invitation to

second guess his counsel's strategic decisions about the evidence to present in support of a claim.

4. State law claims.

Finally, Galvao appeals the dismissal of his state law discrimination and retaliation claims by the district court, arguing that under the more relaxed standard used in Massachusetts [*12] found, on the basis of the evidence that he presented, that Gillette's reasons for failing to upgrade him and terminating him were pretextual. In support of this contention, Galvao cites *Blare v. Husky Injection Molding Systems Boston, Inc., 419 Mass. 437, 646 N.E.2d 111 (1995)*. We read Blare as holding that Massachusetts, while adhering to the three stage McDonnell Douglas analysis, requires that a plaintiff show only that it was more likely than not that the articulated reason for the employer's action was pretextual, rather than providing more direct proof of discriminatory motive by the employer, as the federal standard requires. See *id. at 444-45; see also Lattimore, 99 F.3d at 465*. As discussed, infra (and putting to one side his failure to show that there were similarly situated employees), Galvao failed to adduce any significant evidence to support his claim that Gillette's articulated reasons for its actions were pretextual. Accordingly, his state claim founders on this lack of evidence of pretext, just as his federal one did.

Affirmed.

**THOMAS CONWARD, Plaintiff v. THE CAMBRIDGE SCHOOL COMMITTEE;
and MARY LOU McGRATH, Individually and in her Official Capacity as
Superintendent, Cambridge Public Schools, Defendants**

### CIVIL ACTION NO. 96-11087-GAO

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

### *1998 U.S. Dist. LEXIS 4090*

### March 24, 1998, Decided

**DISPOSITION:** [*1] Defendants' motion for summary judgment on Counts I through IV GRANTED. Final judgment entered in favor of defendants.

**LexisNexis(R) Headnotes**

**COUNSEL:** For THOMAS CONWARD, Plaintiff: Joel P. Suttenberg, Schultz & Bednarz, Boston, MA.

For CAMBRIDGE SCHOOL COMMITTEE, MARY LOU MCGRATH, Defendants: Carol M. Merchasin, Joseph W. Ambash, Allan C. Cave, Jr., Day, Berry & Howard, Boston, MA.

**JUDGES:** George A. O'Toole, Jr., DISTRICT JUDGE.

**OPINIONBY:** George A. O'Toole, Jr.

**OPINION:**

MEMORANDUM AND ORDER

March 24, 1998

O'TOOLE, D.J.

In this wrongful termination action, the defendants Cambridge School Committee and Superintendent Mary Lou McGrath have moved for summary judgment on the plaintiff Thomas Conward's remaining four causes of action: Count I (alleging racial discrimination in violation of *42 U.S.C. § 1981);* Count II (alleging violation of due process under *42 U.S.C. § 1983);* Count III (alleging race discrimination under Title VII); and Count IV (alleging violation of the plaintiff's rights to

free speech, due process, and equal protection). For the reasons that follow, the motion for summary judgment is granted.

Background

From the record it appears that the following facts are not subject to genuine dispute. [*2] Thomas Conward was a tenured social studies teacher at the Cambridge Rindge and Latin School ("CRLS") in Cambridge, Massachusetts, and a member of the Cambridge Teachers Association (the "CTA"). On September 22, 1994, Conward handed a female high school student a document encaptioned "Application for a Piece of Ass." Both parties agree the document can be characterized as "obscene" and offensive. Conward says he picked up the piece of paper off the floor as he and the students were cleaning a classroom and he handed it to the student without reading its contents.

Two days later, Conward received a letter from Superintendent McGrath informing him that he was being suspended temporarily with pay. Subsequently McGrath requested that Conward attend a meeting "for purposes of an investigation concerning your conduct as a teacher." Compl. P 26. Conward says that at this point, in spite of his attempts to find out, he did not know the reason for his suspension or the investigation.

On September 30, Conward attended a meeting with the Superintendent accompanied by Joseph Sullivan, who was both president of the CTA and a lawyer. Shortly before the meeting, Sullivan told Conward that his suspension [*3] was a result of the incident on September 22. At the meeting, McGrath informed Conward that he would be charged with conduct

unbecoming a teacher for handing the offensive document to his student. Conward says that he was given very little time to explain his side of the story, that he was "nervous, confused and intimidated," and that Superintendent McGrath was "irate." Compl. P 31.

In a letter dated October 5, 1994, McGrath gave Conward notice of his immediate suspension without pay for ten school days under applicable Massachusetts law. She also notified him of her intention to dismiss him from his teaching position. In the letter, the Superintendent outlined the grounds for Conward's termination:

> You have engaged in conduct unbecoming a teacher by giving to a student in a study hall on September 22, 1994, an obscene document entitled 'Application for a Piece of Ass.' I and my representatives met with you and Joseph Sullivan, CTA President, to discuss this on September 30, 1994. You were given copies of the document as well as statements of students involved. Although you have disputed certain aspects of student accounts of this incident, you have admitted giving the document [*4] to the student.

Compl. Ex. D. This letter also notified Conward of his statutory right to have a meeting to review the decision to suspend him, "to be represented by counsel in such meeting" and "to provide information pertinent to the decision and to your status." Id. Conward communicated his decision not to request such a meeting in a letter written on his behalf by a staff attorney for the Massachusetts Teachers Association. Defs.' Mem Supp. S.J. Ex. 6. On October 20, 1994, McGrath dismissed Conward. Compl. Ex. E.

After his termination, Conward, represented by counsel, filed a demand for arbitration. The arbitrator found that Conward's termination was for just cause and that there were no mitigating circumstances to reduce the discipline that was imposed. Conward thereafter filed a claim of race discrimination with the Massachusetts Commission Against Discrimination (the "MCAD") and the Equal Employment Opportunity Commission (the "EEOC"). The EEOC investigated Conward's claims, found them unsupported by the evidence, and issued a dismissal and notice of rights order on February 26, 1996. Conward then commenced this action.

### Discussion

Summary judgment is appropriate [*5] whenever "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. This analysis requires "viewing the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995)*. "Moreover, summary judgment may be appropriate even in cases where elusive concepts such as motive or intent are at issue, . . . if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994)* (quoting *Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993)* (internal quotation marks omitted).

### Race Discrimination Claims

Conward's race discrimination claims depend on the proposition that, although he might have been disciplined, he would not have been *fired* for the incident if he were white. Count I of the complaint arises under [*6] *42 U.S.C. § 1981* and alleges that the defendants intentionally discriminated against Conward because of his race. Count III of the complaint alleges unlawful race discrimination under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e-2*(a) (1994). The standard of liability and analysis for intentional race discrimination is substantially identical under both statutes in the employment discrimination context. *Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996)*. If the plaintiff has no direct evidence of racial discrimination, the familiar McDonnell Douglas framework applies. Under that model, the plaintiff must first establish a *prima facie* case of discrimination. If that is established, then the burden shifts to the employer to show a legitimate business reason for the same employment decision. See, e.g., *Smith v. F.W. Morse & Co., 76 F.3d 413, 421 (1st Cir. 1996)*.

In order to make out a *prima facie* case of discriminatory discharge, Conward must show that "he is a member of a protected class, that he was qualified for the job from which he was fired, and 'that the misconduct for which [he] was discharged was nearly identical [*7] to that engaged in by [an employee outside the protected class] whom [the employer] retained.'" *Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984)* (quoting *Davin v. Delta Air Lines, 678 F.2d 567, 570 (1982)*. There is no dispute between the parties that Conward is a member of the protected class under the statute and that he was a professional teacher in the Cambridge School System with twenty-two years of experience and no prior disciplinary record before he was fired. The question is whether Conward has offered

sufficient proof that the Cambridge Public Schools and Superintendent McGrath have not terminated teachers outside the protected class who engaged in misconduct as serious or more serious than Conward's. In order to meet this requirement of the *prima facie* case Conward must

> identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently. The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. **[*8]** In other words, apples should be compared to apples.

*Molloy v. Blanchard, 115 F.3d 86, 91 (1st Cir. 1997)* (internal quotations omitted) (citing *Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989)).* See also *Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996)* ("The proponent of the evidence must show that the individuals with whom he seeks to be compared have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.") (citation and internal quotation omitted).

Conward offers the example of three other teachers whose cases he alleges are similar to his. The first example involved a white male teacher who the Superintendent found had put his hands on the jacket of a male student and pushed him against a wall. That teacher was disciplined with only a written warning. In a second case, a white female teacher was suspended for five days for an incident in which she struck a student and urged him to retaliate by hitting her. n1 Finally, Conward offered evidence about a third case, in which a white male teacher and track coach **[*9]** was accused of improper sexual language and/or behavior with black students on the boys' track team. After an investigation, McGrath disciplined the teacher by imposing a one-year leave of absence from his position as track coach and by requiring him to take a course on racial sensitivity. Conward argues that each of these three teachers was "similarly situated" to him -- that each engaged in conduct which was sufficiently similar to Conward's in all relevant aspects and that the difference between his treatment and their treatment gives rise to a reasonable inference of discrimination.

n1 After this incident, the same teacher was involved in another incident in which she justified a decision to a student by stating that she made the decision "because I am white and you are black." After this incident, she was terminated because the Superintendent determined that her conduct was "egregious and inexcusable standing alone."

These cases are similar in some respects, but they are not similar enough to permit the **[*10]** inference that any difference in their outcomes must be due to racial discrimination, rather than to some other reason. As the Court of Appeals has pointed out, "apples should be compared to apples." *Dartmouth Review, 889 F.2d at 19.* If cases that are so alike in their circumstances that one would expect their outcomes to be the same, and if the outcomes are *not* the same, one then looks for some explaining reason for the unexpected difference. Such a reason might be racial discrimination. But where the difference in outcomes may just as plausibly be the result of a fact or circumstance present in one case but not the other, then it is not possible to infer that an external factor, such as discrimination, was the reason for the difference.

Two recent cases support the conclusion that none of the three cases cited by Conward is similar enough to his to justify the inference that his *prima facie* case must depend on. In Perkins, the court affirmed the entry of summary judgment dismissing a race discrimination claim where it appeared that the conduct of the black plaintiff, who was terminated for harassing female co-workers, was not sufficiently similar to "markedly less **[*11]** serious" conduct by a white employee. *78 F.3d at 751.* In *Anderson v. Boston School Committee, 105 F.3d 762 (1st Cir. 1997),* the court decided that the district court had not exceeded its discretion in excluding from a black former teacher's racial discrimination action evidence of sexual harassment claims against two white school employees for the reason that their cases were not sufficiently similar to the plaintiff's.

As these cases illustrate, for cases to be considered sufficiently similar to permit an inference of discrimination, they must be alike in "all relevant aspects." *Dartmouth Review, 889 F.2d at 19.* Two of the cases Conward points to, and to some extent the third as well, involved allegations of inappropriate physical contact between teacher and student. That is a different category of misbehavior from what Conward was charged with, which can be classified as a species of sexual harassment. That difference alone is substantial enough to defeat the comparison. In the third case, which may have involved some "same sex harassment," the level of discipline imposed was the product of a

settlement negotiated on the teacher's behalf by the union. It may fairly be assumed [*12] that the punishment was consequently lighter than what might have been imposed in the absence of negotiation. A negotiated settlement and a unilaterally imposed punishment are not "fair congeners" permitting comparison. See *Dartmouth Review, 889 F.2d at 19*. Even though the burden of establishing a *prima facie* case is "not onerous," see *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*, it is not nonexistent. Conward has not made out a *prima facie* case of race discrimination, and his claims must be dismissed.

However, even if Conward has made out a *prima facie* case for discrimination, he still cannot survive the "swing of the summary judgment axe." *Mack v. Great Atlantic and Pacific Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)*. Once a plaintiff has established a prima facie case of race discrimination, the burden of production shifts to the defendant to offer a reason for the facially discriminatory conduct. *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)*. The Superintendent says that the reason she punished Conward more severely than the others is because [*13] she believed his conduct to be more reprehensible than that of the other disciplined teachers. One could disagree with this proposition; arguably physical contact with a student deserves greater punishment than what Conward did. Nevertheless, it cannot be said that the Superintendent's reason was so insubstantial that on its face it was plainly pretextual. It is not unreasonable, especially in a time when heightened attention is being paid to the question of sexual harassment, for a school superintendent to regard Conward's conduct as grievous enough to warrant termination. In fact, one of the other disciplinary cases Conward has cited suggests the Superintendent has acted consistently to regard it a more serious offense for a teacher to "harass" a student than to lay hands on a student. In the second case he refers to, the teacher was only suspended for hitting a student, but when she made an offensive remark that could be categorized as racial harassment, she was fired.

Once the Superintendent has given an apparently legitimate, nondiscriminatory reason for her decision, the burden of production returns to Conward to "offer direct or indirect evidence sufficient to show that the [*14] employer's decision to discharge him or her was wrongfully based on race." *Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996)*. In other words, Conward must provide evidence both that the reason proffered by McGrath -- that she considered his conduct more serious than the other teachers' -- was false and that discrimination was the real reason. *Hicks,*

*509 U.S. at 515*. In evaluating this evidence, the Court must use the same standard as in any other summary judgment motion:

> So long as the employer's proffered reason is facially adequate to constitute a legitimate, nondiscriminatory justification for the employer's actions, the trial court's focus in deciding a Rule 56 motion must be on the ultimate question, not on the artificial striations of the burden-shifting framework.
>
> Put another way, under conventional summary judgment practice, a plaintiff must establish at least a genuine issue of material fact on every element essential to his case in chief.

*Mesnick v. General Elec. Co., 950 F.2d 816 (1st Cir. 1991)* (footnote omitted). Conward argues he disbelieves the defendant's proffered reasons for his discharge, and thus the case should [*15] proceed to trial so that a jury can evaluate McGrath's motivations. Conward offers no evidence of racially discriminatory animus other than his assertion that he believes, despite her denials, that McGrath was motivated by racial animus. This is not enough to survive summary judgment. As the Supreme Court has said, "nothing in the law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable." *Hicks, 509 U.S. at 514-15*.

Due Process Claims

Conward's second and fourth causes of action allege that his substantive and procedural due process rights were violated. These claims clearly cannot withstand summary judgment.

As a public employee, Conward has a protectable property interest in his job, *Bishop v. Wood, 426 U.S. 341, 48 L. Ed. 2d 684, 96 S. Ct. 2074 (1976)*, and therefore is entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546,* [*16] *84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985)*. He was afforded these due process rights twice prior to his termination. At the September 30 meeting, he received oral notice of the charge and the evidence the Superintendent had against him, and he had the opportunity "to present his side of the story." Id. Later, McGrath notified him in writing of the charges and her

proposed sanction and gave him the opportunity for another meeting. Through counsel, he specifically declined to exercise that right to a further hearing. He now says he made that choice because a hearing before the Superintendent would have been futile, since she had apparently made up her mind against him. However that may be, due process does not require that a pre-termination hearing be conducted by a neutral decision maker. *Cronin v. Town of Amesbury, 895 F. Supp. 375, 387 (D. Mass. 1995)*, aff'd, *81 F.3d 257 (1st Cir. 1996)*. The employee's supervisor may conduct the hearing. See, *Arnett v. Kennedy, 416 U.S. 134, 170 n.5, 40 L. Ed. 2d 15, 94 S. Ct. 1633* (Powell, J., concurring) ("In most cases, the employee's supervisor is the official best informed about the 'cause' for termination. If disqualification is **[\*17]** required on the ground that the responsible supervisor could not be wholly impartial, the removal procedure would become increasingly complex."). Due process is served if the plaintiff has an opportunity to obtain a meaningful post-termination hearing before a neutral decision maker. *Loudermill, 470 U.S. at 538*. In this case, Conward brought his grievance to a neutral arbitrator. He did not have a constitutional right to more.

First Amendment Claim

Schools are permitted considerable latitude in regulating classroom speech. *Bethel School District No. 403 v. Fraser, 478 U.S. 675, 683-85, 92 L. Ed. 2d 549, 106 S. Ct. 3159 (1986); Ward v. Hickey, 996 F.2d 448, 452-53 (1st Cir. 1993)*. In particular, a school may impose sanctions for offensively lewd and indecent speech. *Bethel School Dist., 478 U.S. at 685*. There is no doubt that a school may punish a teacher for distributing to a student a document like the one in question in this case.

Conward says that he never read anything more than the title of the paper that he handed to the student, and that "if he had read the text of the document, he would not have given it to the student." Pl.'s Mem. Opp. Defs.' Mot. for **[\*18]** Summ. J. at 19. Rather, he argues that his act of giving the document to the student was itself

constitutionally protected speech. He says that he intended it to be an example of the improper use of language at school.

The argument does not save his claim. First, it is doubtful that his act of handing the paper to the student itself amounted to "expression" for purposes of the Free Speech Clause. See *Fowler v. Board of Educ. of Lincoln County, Ky., 819 F.2d 657, 662 (6th Cir. 1987)* (act of exhibiting a movie not protected expression). In any event, even if the act were to qualify as expression, it is the kind of expression that can be regulated by the school. The caption on the document, which Conward acknowledges he read and which he apparently intended the student to read, was itself offensive. There is no difference between the caption and the rest of the document for purposes of First Amendment analysis. Just as the school could punish the dissemination of the entire contents of the document, it could punish the dissemination of the caption.

Conclusion

For the foregoing reasons, the defendants' motion for summary judgment on Counts I through IV is GRANTED.

IT IS SO **[\*19]** ORDERED.

March 24, 1998
DATE

George A. O'Toole, Jr.

DISTRICT JUDGE

**JUDGMENT**

O'Toole, D.J.

March 25, 1998

The court having allowed defendants' Motion for Summary Judgment on March 24, 1998 [see Memorandum and Order], final judgment is hereby entered in favor of defendants.

KOFI DODI, Plaintiff - Appellant, v. THE PUTNAM COMPANIES, Defendant - Appellee.

No. 95-2266

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

*1996 U.S. App. LEXIS 22177*

August 28, 1996, Decided

NOTICE: [*1] RULES OF THE FIRST CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

SUBSEQUENT HISTORY:

Reported in Table Case Format at: *94 F.3d 640, 1996 U.S. App. LEXIS 36688.*

PRIOR HISTORY: APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS. Hon. Robert E. Keeton, U.S. District Judge.

DISPOSITION: Affirmed.

LexisNexis(R) Headnotes

COUNSEL: Kevin G. Powers, with whom Robert S. Mantell and Law Office of Kevin G. Powers were on brief for appellant.

Ilene Robinson, with whom Louis A. Rodriques, Katherine J. Ross and Sullivan & Worcester LLP were on brief for appellee.

JUDGES: Before Torruella, Chief Judge, Cyr and Boudin, Circuit Judges.

OPINION:

Per Curiam. Appellant-defendant Kofi Dodi ("Dodi") appeals the district court's decision granting defendant-appellant The Putnam Companies ("Putnam") summary judgment. Dodi had filed suit under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e-3*(a), and Mass. Gen. L. ch. 151B alleging discrimination on account of his race and national origin and/or retaliation for filing a charge with the Massachusetts Commission Against Discrimination ("MCAD"). The two issues before us are whether the court below abused its discretion in striking Dodi's two affidavits and [*2] portions of his Opposition to Summary Judgment; and whether it erred in granting the summary judgment. For the reasons stated herein, we affirm.

BACKGROUND

We recite the following facts, drawn from the district court Memorandum and Order, in the light most favorable to the nonmovant. *Equal Employment Opportunity Comm'n v. Green, 76 F.3d 19, 21 (1st Cir. 1996).* Dodi is a United States citizen who was born in Ghana and is black. He began working for Putnam in 1984, and by 1987 was part of the Tax and Compliance unit. In December 1989 or January 1990, the department was reorganized. A white female, Michelle Whalen ("Whalen"), was appointed Manager of the Tax and Compliance unit, a position Dodi desired, and which title he maintains was his prior to the reorganization and Whalen's appointment. Dodi complained to several individuals, including Robert Lucey, President of Putnam Investor Services. After he complained, Dodi was made the IRS Technical Manager: he contends that his appointment was an effective demotion, while Putnam labels it a lateral move.

In May 1990, Dodi filed a charge with MCAD alleging that he was demoted and denied promotion on account of his race and [*3] national origin. After he filed the charge, his rating in his performance reviews declined -- his rating dropped to "unsatisfactory" -- and

the reviews suggested increased hostility between Dodi and his supervisors. Dodi contends that he was excluded from meetings and isolated from the department because of the complaint. Putnam fired Dodi in March 1991, roughly ten months after the filing of the MCAD complaint. He filed a second complaint in June 1991, alleging that he was terminated because of his race and national origin, or in retaliation for filing the 1990 complaint, or both.

MCAD dismissed the two complaints in December 1992, for lack of probable cause, a decision it affirmed in January of 1993. Dodi filed a civil action in Massachusetts Superior Court, which Putnam removed to the Federal District Court. The parties made discovery requests and took depositions. Putnam filed a motion for summary judgment, which Dodi opposed. In June 1995, Putnam moved to strike portions of Dodi's Opposition to Summary Judgment (the "Opposition"). Dodi's opposition to the motion to strike contained an affidavit (the "first affidavit") with attachments. At a hearing in July 1995, the district [*4]   court granted Putnam's motion to strike portions of Dodi's Opposition, and struck the first affidavit on its own initiative. It granted Dodi's request for permission to submit supplemental information in support of the stricken statements in the Opposition. In late July Dodi filed a supplemental submission in opposition to Putnam's motion to strike, including another affidavit (the "second affidavit"). In August, Putnam moved to strike the second affidavit, and in October 1995, the district court granted Putnam's motion for summary judgment and its motion to strike the second affidavit. This appeal ensued.

### STRICKEN SUBMISSIONS

We begin with Dodi's argument that the district court erred in striking the affidavits and his Opposition since, if they were admissible, they would form part of the record on which the summary judgment would be evaluated. See *Fed. R. Civ. P. 56(c)*. We review the district court's decision to strike for abuse of discretion. See *Green, 76 F.3d at 23* ("The district court has broad authority to prescribe the evidentiary materials it will consider in deciding a motion for summary judgment."); see also *Ramsdell v. Brooks, 64 F.3d 5, 8 (1st Cir. [*5] 1995)*, cert. denied sub nom. *Ramsdell v. Machias Savings Bank, 133 L. Ed. 2d 844,    U.S.    , 116 S. Ct. 913 (1996); New England Anti-Vivisection Soc. v. U.S. Surgical Corp., 889 F.2d 1198, 1204 (1st Cir. 1989)*.

Under the Federal Rules of Civil Procedure, affidavits "shall be made on personal knowledge, set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *Fed. R. Civ. P. 56(e)*. Accordingly, if the affidavits and Opposition Dodi

submitted did not meet these criteria, the district court can hardly have abused its discretion in striking them. Cf. *Posadas de Puerto Rico, Inc. v. Radin, 856 F.2d 399, 401 (1st Cir. 1988)* (affirming that affidavit which does not meet the Rule 56 specificity requirement is insufficient to establish a genuine issue for trial); *FDIC v. Roldan Fonseca, 795 F.2d 1102, 1110 (1st Cir. 1986)* (holding that where receipts submitted to support opposition to summary judgment constituted inadmissible hearsay, party failed to comply with Rule 56(e)).

Having briefly set out our standard of review and the relevant legal framework, we turn to the particulars [*6] of Dodi's argument. As the parties have addressed the stricken documents according to subject, we follow suit. n1

> n1 In the course of his argument, Dodi several times invites this court to review his affidavits as a whole to determine whether they should have been struck and whether there is admissible evidence included in them. He does not, however, attempt to cull out the admissible portions or cite any authority. We find, therefore, that except for the portions he specifically discusses, he has waived his argument that the affidavits as a whole are admissible, as arguments made perfunctorily on appeal with no developed argument or support are deemed waived. See *United States v. Zannino, 895 F.2d 1, 17* (1st Cir.), cert. denied, *494 U.S. 1082, 108 L. Ed. 2d 944, 110 S. Ct. 1814 (1990)*.

Imitation of Dodi's Accent: The district court struck Dodi's statement in his Opposition that William McGue, Putnam's Managing Director, and Robert Frazer, a white manager, "made fun of Dodi's accent, and imitated him at meetings and during casual [*7] conversations." Dodi seeks to rely on a paragraph from his second affidavit in support of his assertion. We do not find that the district court abused its discretion in striking either the statement from the Opposition or the paragraph in the second affidavit. The statements in the paragraph are conclusory and lack specificity. Moreover, even if it were error to exclude the evidence, it would be harmless, for the imitation does not support Dodi's claim of retaliation, and as discussed below, that is the only cause of action remaining on appeal.

Merit Raises: The district court struck Dodi's statement in the Opposition that he "received raises based on merit," on the basis that there was nothing in the record as to what "merit" meant, or how and on what basis such raises were given. Dodi claims that statements

from the stricken second affidavit provide such verified information. He also points to a computer printout entitled "Salary, Increase & Performance History Screen" which the district court struck as part of the first affidavit, as well as a memorandum sent to him from James Swinney, a Senior Vice President, dated January 2, 1990. We find that the district court did not abuse [*8] its discretion in striking these documents.

Dodi claims that all three meet the requirements to be a business record exception to the hearsay rule. The requirements for the exception are clear: a "memorandum, report, record or data compilation, in any form" is admissible so long as it is

> made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . .

*Fed. R. Evid. 803(6)*; see, e.g., *E.E.O.C. v. Alton Packaging Corp., 901 F.2d 920, 926 (11th Cir. 1990)*. Dodi has not provided the required foundation for these three documents. First, Dodi misunderstands the application of the rule, which applies to memoranda, reports, and record or data compilation, not oral statements, in claiming that it covers oral statements made to him and mentioned in the second affidavit. Second, as for the computer printout, Dodi's statement that in his experience, "such documents are routinely [*9] generated by Defendant in the ordinary course of its business" falls far short of laying out the foundation Rule 803(6) requires. That it was provided to Dodi in discovery does not save it. Third, Dodi has also failed to lay out the foundation for the memorandum from Swinney: although he says he received it in the normal course of business on January 2, 1990, and that it was generated and maintained in the ordinary course of business, we agree with Putnam that there is no support for these claims.

Dodi faces similar foundational issues with his claim that the documents are also admissible as party admissions under *Fed. R. Evid. 801(d)(2)(D)*. He has, to put it briefly, failed to show that the statements he cites to were made by Putnam's "agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." *Fed. R.*

*Evid. 801(d)(2)(D)*. Mere assertion that they were so made does not suffice.

Even if some of these statements had been admissible, however, the court still would not have abused its discretion since, as Dodi notes in his brief, the court based its decision in part on the fact that there was no basis in the record [*10] as to what "merit" meant. In the cited portion of his second affidavit, Dodi notes that instructors from the human resources training department told him that "the Putnam policy was to give merit raises as a reward for satisfactory performance by employees." This statement is clearly not admissible under the business record exception, as he claims, since it was an oral statement. *Fed. R. Evid. 803(6)* (applicable to "[a] memorandum, report, record, or data compilation"). Nor is it a party admission, since he has not addressed the foundational requirements laid out in the rule itself.

EEO-1 Report: Next Dodi argues that the district court erred in striking a 1993 EEO-1 report of Putnam, and the corresponding portion of the first affidavit, which he claims evidences that he reasonably believed that race discrimination existed. In his support he notes that the report was provided in discovery, that Putnam is required by law to produce such reports (Dodi does not specify what law), and that it is a true and accurate copy of the document Putnam provided Dodi. We fail to see how the fact that a document was presented in discovery suffices to authenticate the document or lay the foundational [*11] requirements of Rule 803(6) or Rule 801(d)(2)(D). At any rate, even if the district court erred, it would have been harmless error, since, as Dodi notes, this evidence goes to his prejudice claim, not his retaliation cause of action, which is his sole remaining cause of action.

Swinney Memorandum: Dodi submitted a memorandum he wrote to Swinney, dated December 26, 1989, to show that he had complained about his treatment, in connection with his race discrimination claim. The district court struck the memorandum on hearsay grounds; we agree that the necessary foundation was missing. Dodi's citation of the fact that Putnam is required to generate and maintain a personnel file on its employees does not substitute for the witness testimony required to lay a foundation. *Fed. R. Evid. 803(6)*. However, Dodi also notes that the memorandum is being used, in part, not to prove the truth of the matters asserted, but to demonstrate that Dodi complained of the subjectivity of his performance evaluations, in the context of opposition to perceived race discrimination. But this is a distinction without a difference, since there is no dispute that Dodi protested against perceived racism at Putnam. [*12] Nonetheless, because Swinney was involved in Dodi's termination and thus Dodi's retaliation claim, we shall consider the memorandum for

this limited purpose in our review of the district court's grant of summary judgment.

$ 10,000 Pay Disparity: Dodi next contests the district court's decision to strike a series of statements which alleged that for several years Dodi was paid a salary well below that of white individuals, until he complained. The court struck the statements as conclusory. Having reviewed the cited deposition pages and statements from the second affidavit, we find no abuse of discretion in the ruling. Indeed, we agree with Putnam that Dodi's deposition does not support the premise that he perceived it as a race-based discrepancy in wages, but rather that allegation seems to arise only after the motion for summary judgment has appeared on the horizon. See *Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4 (1st Cir. 1994)* ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of [*13] why the testimony has changed."). Further, any error would be harmless, as the evidence of a pay disparity does not tend to prove retaliatory action, but rather goes to the discrimination claim waived on appeal.

Qualifications of Michelle Whalen: Dodi contests the district court's decision to strike portions of statements alleging that although Whalen was given a higher position than Dodi, she was less qualified for the position than Dodi. The cited deposition pages offer no evidence other than that it was Dodi's belief that Whalen was less qualified, and inadmissible hearsay that she was management's choice. Dodi now points to excerpts from Whalen's personnel file and the job description, which have not been stricken, to support his position; Putnam in turn points out that the promotion was based on managerial abilities, not just narrow technical expertise, and that Dodi fell far short of Whalen in the former category, even if he surpassed her in the latter.

We need not address this debate, for even if the district court erred in striking the statements, the error was harmless. First, the evidence of whether Whalen was more or less qualified than Dodi goes to the waived discrimination [*14] claim, and not to the retaliation claim discussed below. Second, we remind Dodi of our repeated holding that "courts may not sit as super personnel departments, assessing the merits -- or even the rationality -- of employers' nondiscriminatory business decisions." *Mesnick v. General Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991),* cert. denied, *504 U.S. 985, 119 L. Ed. 2d 586, 112 S. Ct. 2965 (1992);* see also *Hoeppner v. Crotched Mountain Rehabilitation Ctr., 31 F.3d 9, 17 (1st Cir. 1994).*

Bresnahan Memorandum: Dodi seeks to admit a memorandum sent from Leslee Bresnahan to Ray Lambert. However, once again, the fact that Putnam provided the document to Dodi in discovery does not establish its authenticity, and the fact that Putnam is required to generate and maintain a personnel file, providing employees a copy of it on demand, does not fulfill the foundational requirements of either Rule 801(d)(2)(D) or Rule 803(6), as simply set out in those rules. The district court did not abuse its discretion in striking the memorandum.

Pattern of Isolation: In his Opposition, Dodi claims that after he complained about the reorganization, Jeff Levering, to whom Dodi was supposed to report, "altered his [*15] behavior towards Dodi, . . . no longer said positive things about Dodi's job performance, and . . . avoided talking with Dodi." He also alleges that he was ostracized, kept out of meetings, and that his co-workers "ceased interacting" with him. The district court struck the opinions as opinion and characterizations. Our review of the cited pages from Dodi's depositions and the second affidavit yields no grounds to find the district court abused its discretion in striking the statements. Dodi does not give specific incidents, place them in time, or give a yardstick by which to measure either the timeliness of his reviews or their content -- indeed, while he repeatedly discusses the supposed content of Levering's weekly status reports, he never actually refers to one.

Failure to Provide Staff: Dodi challenges the district court's decision to strike from the Opposition the statement that Putnam "failed to give Dodi the permanent staff he requested." We find no abuse of discretion here, as Dodi cited no support for the statement in his Opposition. See *Garside v. Osco Drug, Inc., 895 F.2d 46, 49 (1st Cir. 1990).* Indeed, we agree with Putnam that, even if admitted as within [*16] Dodi's personal knowledge, *Fed. R. Civ. P. 56(e),* at best this statement can show only that Dodi did not get all the resources he requested: Dodi points to no evidence regarding Putnam's treatment of analogous request made by non-minority employees, or employees who had not filed MCAD complaints, besides his own assertion that "other departments under McGue" were fully staffed.

Other stricken statements: The district court properly struck the statement that McGue "failed to provide Dodi the supplies and materials necessary" to become more visible within the organization, as instructed. The cited deposition pages offer no admissible support for the proposition, and the passage he cites from the second affidavit constitutes argument and hearsay. Again, however, we note that even if admitted, the statement would at most have shown that Dodi did not get all the supplies he requested, since he does not point to

evidence of the treatment of other, non-minority or non-complaining employees. Merely pointing out that other departments received printers or the like tells us very little.

Finally, Dodi objects to the striking of four statements to the effect that after he made his complaint [*17] his work was reviewed in a less timely manner, he stopped receiving positive feedback or necessary information, and other employees received instructions to keep tabs on his actions and note everything he did. After review of the cited passages from his deposition and the second affidavit, we find that the district court did not abuse its discretion in striking the passages.

### SUMMARY JUDGMENT

Dodi references his cause of action for termination due to race or national origin in his statement of issues, but makes no more than the most cursory reference to it in his brief, and makes no attempt at a developed argument that the district court erred in granting summary judgment on the claim. Accordingly, we deem it waived, *Zannino, 895 F.2d at 17,* and only consider his argument that the district court erred in granting summary judgment on his claim that he was retaliated against because of his opposition to discrimination.

"We review a grant of summary judgment de novo and are guided by the same criteria as the district court; a grant of summary judgment cannot stand on appeal 'unless the record discloses no trialworthy issue of material fact and the moving party is entitled [*18] to judgment as a matter of law.'" *Green, 76 F.3d at 23,* quoting *Alexis v. McDonald's Restaurants of Mass., Inc., 67 F.3d 341, 346 (1st Cir. 1995).* We note that "our review will be most searching in cases, such as this, that turn upon the issue of motivation or intent." *Rossy v. Roche Prods., Inc., 880 F.2d 621, 624 (1st Cir. 1989).*

We apply the McDonnell Douglas framework to Dodi's retaliation claim. See *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); Oliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir. 1988).* First, Dodi must establish a prima facie case by showing that:

> (1) [he] engaged in a protected activity as an employee, (2) [he] was subsequently discharged from employment, and (3) there was a causal connection between the protected activity and the discharge.

*Hoeppner, 31 F.3d at 14.* Under Massachusetts law, the framework is slightly different. To succeed,

> the plaintiff must prove that she reasonably and in good faith believed that [Putnam] was engaged in wrongful discrimination, that [he] acted reasonably in response to [his] belief, and that [Putnam's] desire to retaliate against [*19] [him] was a determinative factor in its decision to terminate [his] employment.

*Tate v. Department of Mental Health, 419 Mass. 356, 645 N.E.2d 1159, 1165 (Mass. 1995).*

Next, the burden shifts to Putnam to articulate a legitimate, nondiscriminatory reason for the discharge. If it does so, "in order to escape summary judgment under federal and [Massachusetts] law, [Dodi] must at least introduce sufficient evidence to permit the factfinder to infer that [Putnam's] stated reason for the termination was pretextual." n2 *Grant v. News Group Boston, Inc., 55 F.3d 1, 7 (1995);* see, e.g., *Hoeppner, 31 F.3d at 14; LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842-43 (1st Cir. 1993),* cert. denied, *511 U.S. 1018, 128 L. Ed. 2d 72, 114 S. Ct. 1398 (1994); Blare v. Husky Injection Molding Sys., Boston, Inc., 419 Mass. 437, 646 N.E.2d 111, 117 (Mass. 1995).*

> n2 Dodi argues that proof of pretext is not always required. However, his reliance on *Patterson v. McLean Credit Union, 491 U.S. 164, 187, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989),* for that proposition is misplaced, since the cited passage notes that a petitioner can present a variety of types of evidence to establish pretext, not that it need not be established. Our case law offers no doubt that in retaliation claims, the McDonnell Douglas analysis requires a showing of pretext. See, e.g., *Grant, 55 F.3d at 7; Greenberg v. Union Camp Corp., 48 F.3d 22, 29 (1st Cir. 1995).*

### [*20]

The district court found that Dodi had not satisfied the third element of the prima facie case. Assuming nonetheless that Dodi could establish a prima facie case, it found that Putnam easily cleared the hurdle of articulating a reason for the dismissal -- that Dodi's work was viewed as sub-standard and that he received poor performance reviews, suggesting missed deadlines and poor communication between Dodi and his supervisors and his staff. Thus the court moved to the third step of

the analysis, where it found that Dodi could not show that Putnam's asserted reason was pretextual.

We also doubt that Dodi can make a prima facie case. However, even assuming that Dodi could meet the prima facie requirement, and acknowledging that Putnam has articulated a reason for the dismissal, we find that Dodi cannot meet the third requirement of the McDonnell Douglas analysis. Put simply, even given the benefit of all inferences, he has not shown that Putnam's asserted reason was false, much less that its real motivation was retaliation. Like the district court before us, we have found no evidence on this record which supports a finding that his evaluations were inaccurate, or which reveals [*21] that Dodi was treated differently than his non-minority or non-complaining counterparts. See *Wynne v. Tufts Univ. Sch. of Medicine, 976 F.2d 791, 796 (1st Cir. 1992)* ("When pretext is at issue in a discrimination case, it is a plaintiff's duty to produce specific facts which, reasonably viewed, tend logically to undercut the defendant's position."), cert. denied, *507 U.S. 1030, 123 L. Ed. 2d 470, 113 S. Ct. 1845 (1993).*

Dodi makes much of the fact that McGue learned of Dodi's MCAD complaint on the day he decided to terminate Dodi, at a meeting in which McGue and Swinney -- who testified at his deposition that he was very angry about the claim -- discussed Dodi's termination. We do not doubt that the timing of when the relevant decision maker learned that a complaint was filed and when the dismissal occurred can be demonstrative of retaliation. See *Oliver, 846 F.2d at 110.* Indeed, the timing of the discussion here weighs in favor of Dodi having made a prima facie case. See *Wyatt v. City of Boston, 35 F.3d 13, 16 (1st Cir. 1994)* (finding that timing of employer's knowledge of protected activity and dismissal helps establish a prima facie case); *Rowlett v. Anheuser-Busch, Inc., 832 F.2d 194, 202 [*22] (1st Cir. 1987)* (same).

However, "the filing of an MCAD complaint is not some magic shield that insulates the employee from termination regardless of the circumstances." District Court Memorandum and Order, at 15. Dodi himself notes that the reference to his MCAD claim was made "in passing." We fail to see how a passing reference can suffice to show that Putnam's asserted reason for firing Dodi was a pretext, n3 especially as Dodi points to nothing else of real substance in his support: the "history" of retaliation he argues existed, as well as the alleged inconsistencies in who claimed authority to fire him, and why, do little, if anything, to further his cause. "In this circuit, we have always required not only 'minimally sufficient evidence of pretext,' but evidence that overall reasonably supports a finding of [retaliation]," and Dodi has not met that mark. *LeBlanc, 6 F.3d at 842-43* (quoting *Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1117 (1st Cir. 1993)*).

n3 Dodi's reliance on *College-Town, Division of Interco, Inc. v. Massachusetts Comm'n Against Discrimination, 400 Mass. 156, 508 N.E.2d 587 (Mass. 1987)*, is misplaced. There, the reference to the complaint was dramatically greater than here: the employee was told "'Loretta, it has come to my attention that you are suing College-Town. It's been done before. Here is your vacation, your severance pay or whatever, and good luck. May I have your badge?'" *508 N.E.2d at 590.* The circumstances here in no way rise to the level of these facts.

[*23]

**CONCLUSION**

For the foregoing reasons, the decision of the district court granting Putnam summary judgment is affirmed.